Mary Esther NUNSUCH, an incapacitated person, By and Through her husband and next friend, Troy NUNSUCH, et al., Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CIV.97–618–PHX–ROX.

United States District Court, D. Arizona.

July 13, 2001.

Thomas P. McGovern, James J. Leonard, Jr., Kenneth P. Clancy, Tyrone Mitchell, Leonard Clancy & McGovern PC, for Plaintiffs.

James E. Howard, Jennifer A. Shah, U.S. Dept. of Justice Torts Branch Federal Tort Claims, Washington, DC, James C. Hair, Jr., U.S. Attorney's Office, Phoenix, AZ, for Defendants.

Wade Randall Causey, Koeller Nebeker Carlson & Haluck LLP, Phoenix, AZ, for Claimant.

## Order

SILVER, District Judge.

## BACKGROUND

This is a medical negligence action brought in March, 1997 by Troy Nunsuch ("Troy") on behalf of his wife, Mary Esther Nunsuch ("Mary Esther"), for himself, and on behalf of their three minor children, Mary Alice, Tyrone, and Tray Nunsuch against the United States Government (Defendant). Mary Esther is a Navajo who is permanently mentally and physically incapacitated. Since the commencement of the action, the Superior Court of Maricopa County has appointed as Mary Esther's Guardian/Conservator Gregory Dovico of Southwest Fiduciary, Inc., and the Superior Court of Navajo County has appointed Sherry Lynn Johnson as Guardian/Conservator for Mary Alice, Joanne Michele Johnson as Guardian/Conservator for Tyrone, and Charles Johnson as the responsible party representing the interests of Tray.

On September 2, 1994, Mary Esther underwent mitral valve replacement surgery at University Medical Center in Tucson ("UMC"), and was discharged home to Mesa on September 8, 1994. The surgery and post-surgical care of Mary Esther at UMC was arranged by cardiologist James M. Galloway, Director of the Southwest Native American Cardiology Program and

an employee of the Indian Health Service ("IHS") of Department of Health and Human Services, an agency of the United States. Dr. Galloway had an office at, and directed the Program from UMC. On September 9 at 8:30 p.m., following late-morning laboratory studies at Phoenix Indian Medical Center ("PIMC"), she presented to the Emergency Room ("ER") at PIMC, and was treated for right side chest pain by Defendant's employees, physicians Dr. Eric W. Ossowski, Dr. David Gayton and nurses Maria Santiago and Patricia Linville. She was transferred from PIMC ER by AirEvac to UMC early September 10, where she suffered a cardiac arrest about 5:00 a.m. which caused brain injury, permanently incapacitating her.

Plaintiffs allege that the Defendant was negligent regarding the discharge of Mary Esther on September 8, 1994, her treatment at the PIMC ER, including her transport on September 9–10, 1994 to UMC, and her treatment upon her return to UMC September 10, 1994. They seek compensatory damages and damages for past and future medical costs, pain and suffering, and loss of earnings and earning capacity for Mary Esther and for loss of consortium for Troy and their three children.

A similar medical negligence action in the Superior Court of Maricopa County, which was brought in August 1995 by Troy against UMC, the Arizona Board of Regents which operates UMC, and University Physicians which staffs it has been settled. The United States, with this Court's approval, has designated as non-parties at fault in this action the defendants in the state action.

The Defendant denied that the discharge of Mary Esther from UMC on September 8, 1994, and her care at the PIMC ER including her transport to UMC, and her care at UMC on September 9–10, 1994, was below the standard of care or

made more probable than not her cardiac arrest and resultant anoxic brain injury. Alternatively, the Defendant's position is that, if the Court finds that care and treatment of Mary Esther by Defendant's employees fell below the standard of care, the Court should nevertheless find the nonparties at fault and 100% responsible for liability and damages.

Jurisdiction of this action is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1) and 2671, *et seq.*, and venue is conferred by 28 U.S.C. § 1402(b).

### GOVERNING LEGAL AUTHORITY

"Suits against the United States and its agencies are barred by sovereign immunity unless permitted by an explicit waiver of immunity from suit." *Sigman v. United States*, 217 F.3d 785, 792 (9th Cir.2000). By enacting the FTCA, "Congress waived the United States' immunity from suits for money damages for traditional tort claims[.]" *Id.* The FTCA provides, in pertinent part: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. Although various limitations have been imposed on this "broad waiver of immunity," *see, e.g. Sigman*, 217 F.3d at 792–93, none of those limitations are applicable in the case at bar.

In actions brought under the FTCA, the government's liability is to be determined "in accordance with the law of the place where the [negligent] act or omission occurred." 28 U.S.C. § 1346(b)(1); *Taylor v. United States*, 821 F.2d 1428, 1430 (9th Cir.1987), *cert. denied*, 485 U.S. 992, 108 S.Ct. 1300, 99 L.Ed.2d 510 (1988). Accordingly, "the substantive law of the place where the act

or omission occurred" governs questions of liability. *Valencia v. United States,* 819 F.Supp. 1446, 1463 (D.Ariz.1993) (citing *Aguilar v. United States,* 920 F.2d 1475, 1477 (9th Cir.1990), and 28 U.S.C. § 1346); *see also Simmons v. United States,* 805 F.2d 1363, 1368 (9th Cir.1986) ("The determination of liability under the FTCA is controlled by the law of the place where the allegedly tortuous acts occurred."). Because the alleged medical negligence in this case occurred in the State of Arizona, Arizona substantive law controls. *See Taylor,* 821 F.2d at 1430; *Valencia,* 819 F.Supp. at 1463.

## A. Medical Malpractice in Arizona

Medical malpractice claims in Arizona are governed by statute. *See* A.R.S. §§ 12–561, *et seq.* Pursuant to A.R.S. § 12–561(2):

> "Medical malpractice action" or "cause of action for medical malpractice" means an action for injury or death against a licensed health care provider based upon such provider's alleged negligence,[1] misconduct, errors or omissions, or breach of contract in the rendering of health care, medical services, nursing services or other health-related services or for the rendering of such health care, medical services, nursing services or other health-related services, without express or implied consent including an action based upon the alleged negligence, misconduct, errors or omissions or breach of contract in collecting, processing or distributing whole human blood, blood

components, plasma, blood fractions or blood derivatives.

"No medical malpractice action shall be brought against a licensed health care provider except upon the grounds set forth in § 12–561." A.R.S. § 12–562(A).

A plaintiff's burden of proof in a medical malpractice action is prescribed by A.R.S. § 12–563, which provides:

> Both of the following shall be necessary elements of proof that injury resulted from the failure of a health care provider to follow the accepted standard of care:
>
> 1. The health care provider failed to exercise that degree of care, skill and learning expected of a reasonable, prudent health care provider in the profession or class to which he belongs within the state acting in the same or similar circumstances.
>
> 2. Such failure was a proximate cause of the injury.

"In order to satisfy the requirement of establishing a standard of care and a deviation from that standard, plaintiffs must present evidence that the health care provider failed to exercise the degree of care, skill and learning expected from a reasonable, prudent health care provider in the profession to which he or she belongs under the same or similar set of circumstances in the state of Arizona." *Valencia,* 819 F.Supp. at 1463 (citing *Bell v. Maricopa Medical Center,* 157 Ariz. 192, 194–195, 755 P.2d 1180, 1182–1183 (1988)). Ordinarily, a plaintiff must "present expert evi-

---

**1.** To prevail on a claim of negligence, a plaintiff must prove:

1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.

2. A failure on [defendant's] part to conform to the standard required....

3. A reasonably close causal connection between the conduct and the resulting injury....

4. Actual loss or damage....

*Ontiveros v. Borak,* 136 Ariz. 500, 504, 667 P.2d 200, 204 (1983) (citing W. Prosser, Handbook on the Law of Torts § 30, at 143 (4th ed.1971)).

dence of the accepted conduct of the profession and the defendant's deviation from that standard unless the negligence is so grossly apparent that a layman would have no difficulty in recognizing it." *Valencia,* 819 F.Supp. at 1463 (citing *Peacock v. Samaritan Health Serv.,* 159 Ariz. 123, 765 P.2d 525 (1988)). In any case, a plaintiff must present specific evidence of the standard of care. *Valencia,* 819 F.Supp. at 1463 (cites omitted).

"[A] negligence action may be maintained only if there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Markowitz v. Arizona Parks Board,* 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). Whether a duty of care exists is a question of law. *Id.* Although a duty of care may exist in a given situation, it alone does not prescribe the requisite standard of conduct. *Id.* at 355, 706 P.2d at 367.

■ Hospitals are "required to exercise the skill and knowledge normally possessed by like institutions in similar communities." *Faris v. Doctors Hosp., Inc.,* 18 Ariz.App. 264, 270, 501 P.2d 440, 446 (1972). In a hospital malpractice case, where a doctor's negligence is "so grossly apparent that a layman would have no difficulty in recognizing it[,]" the doctrine of *res ipsa loquitur* applies. *Id.* at 269–70, 501 P.2d at 445–46. Where the negligence is not "so grossly apparent," expert medical testimony is required to assist the trier of fact. *Id.* at 270, 501 P.2d at 446.

■ Hospitals are not permitted to deny emergency medical care to patients who need such care. *Thompson v. Sun City Community Hosp., Inc.,* 141 Ariz. 597, 602, 688 P.2d 605, 610 (1984). A patient in need of emergency medical treatment may not be transferred from one hospital to another "until all medically indicated emergency care has been com-

pleted." *Id.* However, such a patient may be transferred for "reasonable cause," the determination of which rests upon "medical considerations relevant to the welfare of the patient and not economic considerations relevant to the welfare of the hospital." *Id.* at 603, 688 P.2d at 611. A hospital may possess one of three possible defenses to a charge that it has denied emergency medical care: "(1) that the hospital is not obligated (or capable) under its state license to provide the necessary emergency medical care, (2) there is a valid medical cause to refuse emergency care, (3) there is no true emergency requiring care and thus no emergency care which is medically indicated." *Id.* Whether an emergency exists, and what constitutes the proper modalities of treatment for the emergency, present questions of fact. *Id.*

■ A physician's duty of care to a patient is distinct from the duty of care owed by a hospital. *Id.* at 604, 688 P.2d at 612.

> No statute requires the physician to provide services separate and apart from those which the hospital is required to provide. Thus, the duty of care owed by a physician is determined by common law principles which require reference to that which is usually done by members of the profession.

*Id.* "The burden is on a plaintiff to establish the applicable standard of care." *Kalar v. MacCollum,* 17 Ariz.App. 176, 178, 496 P.2d 602, 604 (1972). "A doctor is not liable in negligence for his mere mistakes in judgment in the treatment of his patient, but is only liable where his treatment falls below the recognized standards of good medical practice." *Id.* "[U]nless the conduct complained of by the doctor is readily ascertainable by laymen, the standard of care must be established by medical testimony." *Id.; see also Gaston v. Hunter,* 121 Ariz. 33, 49, 588 P.2d 326, 342

(1978) (requiring expert medical testimony to establish standard of care). "[N]o presumption of negligence arises from the mere fact of unsuccessful treatment[.]" *Id.* at 50, 588 P.2d at 343. Moreover, "absent negligence by the physician there is no malpractice when the plaintiff suffers an adverse result which is an inherent risk of the procedure performed[.]" *Id.*

 "[A] doctor does not commit malpractice simply because he employs a method of diagnosis or a course of treatment some doctors do not find efficacious." *Borja v. Phoenix General Hosp.,* 151 Ariz. 302, 304–05, 727 P.2d 355, 357–58 (1986). A doctor's use of such a method or course of treatment does not fall below the standard of care if "a respectable minority of physicians approve the disputed technique and so long as the defending doctor properly employed that technique[.]" *Id.* at 304, 727 P.2d at 357; *see also Leech v. Bralliar,* 275 F.Supp. 897, 902 (D.Ariz. 1967) (finding no malpractice as a matter of law where a "respectable minority of physicians in the United States" utilized the disputed treatment); *but see* A.R.S. § 12–563(1) (limiting standard of care to physicians within Arizona).

 A plaintiff in a medical malpractice action must also show proximate causation. *See* A.R.S. § 12–563(2). A plaintiff "must present facts from which negligence and a causal relation between the injury and the defendant's acts may be reasonably inferred." *Valencia,* 819 F.Supp. at 1463 (citing *Harvey v. Kellin,* 115 Ariz. 496, 566 P.2d 297 (1977)). "The court 'must find for the defendant unless [it] finds[s] a *probability* that defendant's negligence was a cause of plaintiff's injury.'" *Valencia,* 819 F.Supp. at 1464 (citing *Thompson,* 141 Ariz. at 608, 688 P.2d at 616 (emphasis in original)). "Arizona law holds that cause-in-fact exists if the defendant's act helped cause the final result and if that

result would not have happened without the defendant's act." *Ontiveros,* 136 Ariz. at 505, 667 P.2d at 205. The "[d]efendant's act need not have been a 'large' or 'abundant' cause of the final result; there is liability if the result would not have occurred but for defendant's conduct, even if that conduct contributed 'only a little' to plaintiff's injuries." *Id.*

## B. Damages

 If a court determines that a defendant is liable for medical malpractice, it must then determine the measure of damages in accordance with the law of the state where the malpractice occurred. *Shaw v. United States,* 741 F.2d 1202, 1205 (9th Cir.1984) (citation omitted). However, the United States cannot be liable for punitive damages or interest prior to the judgment. 28 U.S.C. § 2674. There are three "basic steps for calculating pecuniary damages under the FTCA: (1) compute the value of the plaintiff's loss according to state law; (2) deduct federal and state taxes from the portion for lost earnings; and (3) discount the total award to present value." *Shaw,* 741 F.2d at 1205.

### 1. Arizona Law

 In Arizona, "[a]s a general rule, a plaintiff in a tort action is entitled to recover such sums as will reasonably compensate him for all damages sustained by him as the direct, natural and proximate result of such negligence, provided they are established with reasonable certainty." *Continental Life & Accident Co. v. Songer,* 124 Ariz. 294, 304, 603 P.2d 921, 931 (1979). "Arizona allows unlimited recovery for actual damages, expenses for past and prospective medical care, past and prospective pain and suffering, lost earnings, and diminished earning capacity." *Wendelken v. Superior Court in and for Pima County,* 137 Ariz. 455, 671 P.2d 896 (1983); *see also*

*Standard Oil Co. of California v. Shields,* 58 Ariz. 239, 119 P.2d 116 (1941).

▆ To recover future medical expenses, it is not required that the injured party be willing to undergo future medical treatment. *Besch v. Triplett,* 23 Ariz.App. 301, 303, 532 P.2d 876, 878 (1975). Nevertheless, it must be "reasonably probable" that the treatment will be given. *Griffen v. Stevenson,* 1 Ariz.App. 311, 312, 402 P.2d 432, 433 (1965). There must be evidence of permanent injury to recover future medical expenses, *see id.* at 305, 532 P.2d at 880, but "the mere fact of permanency does not in itself constitute a sufficient basis for the award of future medical expenses." *Valley Nat'l Bank of Arizona v. Haney,* 27 Ariz.App. 692, 694, 558 P.2d 720, 722 (1976). Evidence of future medical expenses must be definite with respect to the duration, amount of treatment, and the cost in order to support an award of damages. *Id.; Hirsh v. Manley,* 81 Ariz. 94, 103, 300 P.2d 588, 594 (1956).

▆ "Loss of earnings is an item of special damage and must be specially pleaded and proved." *Mandelbaum v. Knutson,* 11 Ariz.App. 148, 149, 462 P.2d 841, 842 (1969). In addition to loss of earnings, a plaintiff may recover for diminished earning capacity. *Id.* Impairment of earning capacity, however, "is an item of general damage, permitting recovery for loss or diminution of the power to earn in the future and is based upon such factors as plaintiff's age, life expectancy, health, habits, occupation, talents, skills, experience, training and industry." *Id.* at 149–50, 462 P.2d at 842–43. To recover for diminished earning capacity, a plaintiff "must establish the fact of diminished capacity and the fact that it is permanent." *Id.* at 150, 462 P.2d at 843. A plaintiff is not required to prove wages or prior employment in order to recover for diminished earning capacity, but she is required to

prove that she has the capacity to acquire money. *Id.* at 150–51, 462 P.2d at 843–44.

▆ "[D]amages for pain and suffering must be reasonably certain and cannot be predicated upon conjecture and speculation." *Allen v. Devereaux,* 5 Ariz.App. 323, 326, 426 P.2d 659, 662 (1967). Rather, it is "necessary to show by the evidence either that the pain and suffering actually did exist, or that the injuries were of such a nature that it would presumably follow therefrom." *Olsen v. Mading,* 45 Ariz. 423, 432, 45 P.2d 23, 26 (1935). Recently the Arizona Court of Appeals recognized the right of recovery for the loss of enjoyment of life, or hedonic damages, that is the participation in life's activities to the quality and extent normally enjoyed before the injury. *Ogden v. J.M Steel Erecting, Inc.,* 201 Ariz. 32, 31 P.3d 806, 2001 WL 579805 (2001). In the same opinion the court reaffirmed that damages for disability and disfigurement may be awarded where appropriate. *Id.*

▆ Arizona also permits parties to recover for loss of consortium. A husband may recover for the loss of his wife's consortium. *See City of Glendale v. Bradshaw by and Through Bradshaw,* 108 Ariz. 582, 583–84, 503 P.2d 803, 804–05 (1972). A definition incorporated in *Bradshaw* from a South Dakota case provides the essence of this marital interest shared by husband and wife:

> . . . the society, companionship, conjugal affections and assistance of the other; the so-called sentimental elements of consortium, to which each has the right.

With respect to loss of consortium for children the Arizona Supreme Court allows recovery when a parent "suffers serious, permanent, disabling injury rendering the parent unable to provide love, care, companionship, and guidance to the child. The parent's mental or physical impairment must be so overwhelming and severe

that the parent-child relationship is destroyed or nearly destroyed." *Villareal v. State Dept. of Transp.*, 160 Ariz. 474, 774 P.2d 213, 219 (1989).

## 2. Federal Law

▮ "[A]s a matter of federal law, income taxes should be deducted from FTCA award for lost compensation." *Shaw*, 741 F.2d at 1206.[2] The failure to deduct income taxes from an FTCA award is tantamount to an award of punitive damages against the United States, which is prohibited by the FTCA. *Id.; see also* 28 U.S.C. § 2674. However, where a lump sum is awarded in an FTCA action, the "award should correspondingly be increased by the amount of income tax that would have to be paid on the earnings of the total award." *Shaw*, 741 F.2d at 1206; *see also DeLucca v. United States*, 670 F.2d 843, 845 (9th Cir.1982). The amount of income taxes which should be deducted will not necessarily equal the amount which should be added to the award. *Shaw*, 741 F.2d at 1206.[3]

▮ "The collateral source rule is well-established in Arizona tort law." *Siverson v. United States*, 710 F.2d 557, 559 (9th Cir.1983). The collateral source rule "permits an injured party to recover medical expenses from a tortfeasor, notwithstanding reimbursement of such expenses by the injured party from a third party, if such reimbursement is from a 'collateral source' and not from a tortfeasor." *Id.*

When determining whether payments received by an injured party constitute a "collateral source," a court must consider whether the injured party contributed to the fund which is making those payments. *See id.* at 559–60 (distinguishing *Overton v. United States*, 619 F.2d 1299 (8th Cir.1980) on the basis that the injured party in *Overton* had not made contributions to the fund). Where the fund is "supplied in part by the beneficiary or a relative upon whom the beneficiary is dependent[,]" the benefits paid from that fund are considered to come from a "collateral source" and may not be deducted. *United States v. Harue Hayashi*, 282 F.2d 599, 603–04 (9th Cir. 1960).

▮ Where a court awards an amount to cover residential care, that amount should not be deducted from an award for lost earnings. *Yako v. United States*, 891 F.2d 738, 747 (9th Cir.1989). The *Yako* court concluded that "separate awards for future medical and maintenance costs and for lost earnings" do not violate the FTCA's prohibition against punitive damages, and it found that "the refusal to award separate costs for these items may interfere with the FTCA's provision for recovery in accordance with local law." *Id.* "Because [Arizona] permits recovery for future medical and maintenance costs and lost future earnings," it is not improper for a district court to award separate amounts for these items. *Id.*

---

**2.** Arizona courts do not allow projected income taxes to be deducted from an award of damages. *See Seely v. McEvers*, 115 Ariz. 171, 174, 564 P.2d 394, 397 (1977). However, in FTCA cases, such a deduction must be made even if disallowed by the state court. *See Felder v. United States*, 543 F.2d 657, 670 (9th Cir.1976).

**3.** In *Shaw*, 741 F.2d at 1206, the Ninth Circuit held that "the district court may not assume that the failure to deduct taxes on lost compensation will offset the taxes on the in-

come generated by the lump sum award unless two conditions are met." The first condition is that "the state whose law otherwise applies must also have adopted the offset approach." *Id.* The second condition is that "the district court must be unable to arrive at its own reliable estimates of future inflation and interest rates from the testimony of expert witnesses." *Id.* Because the parties agree that the first condition is not met, the Court will not assume that there would be an offset.

■ "[A]wards based on income streams spread over time are usually discounted to present value to account for the fact that a plaintiff, by receiving the money in a lump sum, 'up front,' will invest the sum and earn additional income from the investment." *Trevino v. United States,* 804 F.2d 1512, 1517 (9th Cir.1986), *cert. denied,* 484 U.S. 816, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987). "The discount rate should be based on 'the best and safest investments.'" *Id.* (internal quotes and cite omitted).

A net positive discount rate implies that the gains from safe investments exceed the losses induced by inflation—in other words, that the rate chosen to reflect the interest rate on the safest investments over a fixed period of time will be a larger number than the rate chosen to reflect the rate of inflation over the same period of time....

Obviously it is possible for the true rate of inflation to outstrip the return on the safest investments for some period of time. This would justify for that period of time a negative discount rate.

*Id.*

■ When selecting a discount rate, the Court must "select an accurate measure of historical inflation as the basis for its prediction of future inflation." *Id.* at 1518. A court may adopt a discount rate greater than 3% or less than 1% if "credible expert testimony" supports it. *Id.* at 1519. The Court must be cautious, however, not to confer a "double benefit" on either the injured party or the government. *Id.* at 1519–20.

[I]t is impermissible either (1) to exclude the effects of inflation in determining the size of the lost income stream and employ a discount rate equal to the market rate of interest, or (2) to include the effects of inflation in determining the size of the lost income stream and employ a discount rate measured by the difference between the market rate of interest and the rate of inflation. The former denies the injured party any adjustment for inflation while making available such adjustment to the party deemed responsible for the injury. The latter, on the other hand, provides to the injured party an adjustment for inflation in determining the size of the lost income stream and denies to the party deemed responsible for the injury any benefit of that adjustment in determining the proper discount rate. Put more succinctly, the former accords the party deemed responsible for the injury a "double benefit," while in the latter the "double benefit" passes to the injured party. Neither party is entitled to a "double benefit."

*Id.* (cite omitted).

■ "The present value of a lump sum award may be determined (1) by calculating the difference between the market rate of interest and the anticipated rate of inflation and then discounting by this real interest rate; (2) by including the effects of inflation and discounting by the market interest rate; and (3) by employing a zero discount rate (the total offset approach)." *Colleen v. United States,* 843 F.2d 329, 331 (9th Cir.1987). The total offset approach, however, "is unacceptable as a uniform method to calculate present value, although it may be stipulated to by the parties or applied by the trial court in an appropriate case." *Id.*

■ The Court "has the inherent power to order the parties to place [a] money judgment into a fully reversionary trust if such an arrangement is in [the injured party's] best interest." *Hull v. United States,* 971 F.2d 1499, 1504 (10th Cir.1992), *cert. denied,* 507 U.S. 1030, 113 S.Ct. 1844, 123 L.Ed.2d 469 (1993). However, the Court "cannot subject the government to ongoing obligations" such as continuing

payments. *Id.* at 1505. In addition, under a reversionary trust, only future medical expenses and not lost wages should revert to the government. *Hill v. United States,* 81 F.3d 118, 121 (10th Cir.), *cert. denied,* 519 U.S. 810, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996).

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

All acts which gave rise to these claims occurred within the District of Arizona. This case was tried to the District Court seated without a jury as required by 28 U.S.C.A. § 2402. The Court has considered testimony of all the witnesses at trial, including experts, admitted deposition testimony, and all exhibits admitted at trial. After a careful review of the evidence in conjunction with the applicable law the Court makes the findings of fact and conclusions of law set forth below.

### 1. Liability

■ The following medical facts presented at trial were essentially uncontested:

a. All claims arose from injuries occasioned to Mary Esther during the time frame of September 8, 1994 through September 10, 1994.

b. Mary Esther was 32 years old at the time of her injuries.

c. Mary Esther had been a long-term patient at PIMC prior to September 1994.

d. In her teenage years, Mary Esther developed rheumatic fever which resulted in a mitral valve problem.

e. In July 1994, Mary Esther was sent by Dr. Nathan Clifford, her cardiologist and an employee of the PIMC, to Dr. Galloway at the University of Arizona Health Sciences Center for evaluation.

f. During all of his care of Mary Esther, Dr. Galloway was a federal employee.

g. Based upon evaluations of Mary Esther an echo cardiogram was performed on August 31, 1994 and a cardiac catheterization was performed on September 1, 1994 at UMC.

h. Dr. Galloway performed the cardiac catheterization with another doctor at UMC.

i. Catheterization and echocardiography did not reveal any left ventricle dysfunction, but did confirm regurgitation at the mitral valve, pulmonary hypertension and the need for corrective surgery.

j. The decision was made to perform the mitral valve replacement on September 2, 1994.

k. The mitral valve surgery was performed on September 2, 1994, by Dr. G.K. Sethi with Dr. Andrew Tsen and a resident, Dr. Susanna Gordon who was in attendance, all employees of UMC.

l. Plaintiffs have asserted no claims arising out of the mitral valve surgery performed on Mary Esther, and it appears to have been successful. Dr. Clifford sent Mary Esther to UMC because it was his "understanding [UMC] did it better than anyone else" and he "had had [UMC] repair valves before." (Cliff. depo. 47). In Dr. Galloway's September 9, 1994 letter to Dr. Clifford regarding the surgery, he remarked that Mary Esther "underwent mitral valve replacement" "without complications." (Cliff. depo. Ex. 2).

m. Mary Esther received postoperative rehabilitative care at UMC. Accord-

ing to her chart, discharge was slated for September 9, 1994.

n. Mary Esther's husband, Troy Nunsuch, was never called or alerted that Mary Esther was coming home on the evening of the 8th. However, for reasons explained below the Court finds that contacting him would have been of little or no value in avoiding or diminishing the possibility of her cardiac arrest and injuries.

o. Mary Esther's medical records contain certain "Cardiac Rehabilitation Guidelines."

p. It was the team responsibility of the doctors at UMC and Dr. Galloway to properly discharge Mary Esther, but Dr. Galloway had, and gave, the final approval and authorization for her discharge.

q. Without objection from the UMC doctors, Dr. Galloway moved the discharge up to the evening of September 8, 1994. He directed her to get an INR test (anticoagulation test) the next morning at PIMC in Phoenix.

r. After discharge Mary Esther was driven to her home by three family members. All three family members lived in Navajo County. Mary Esther lived in Mesa (Maricopa County) with her husband and their three young children. (TT 604, 607, 609)

s. On September 9, 1994, Mary Esther left her home in Mesa to obtain the INR test. The records at PIMC ER indicate that she took a bus ride sometime that day. It was a hot day, and she was required to travel to and from Mesa and Phoenix, which was a long trip.

t. The temperature in Arizona on September 9, 1994, according to the Na-

tional Climatic Data Center, reached highs between 101° and 104°.

u. When Troy Nunsuch returned home from work the evening of the 9th, he found Mary Esther laying in bed complaining of chest pain. A decision was made to seek medical attention and Mary Esther was taken to PIMC ER.

v. At 8:30 p.m. Mary Esther was admitted to and treated at PIMC ER with "right chest wall" pain. The admission was approximately 25 hours after her discharge from UMC in Tucson.

w. All of Mary Esther's care at PIMC ER took place between 8:30 p.m. and 1:24 a.m. At 1:24 a.m. she was transferred by AirEvac to UMC in Tucson. That transfer was precipitated by a near midnight phone consult between Dr. Ossowski at PIMC ER and Dr. Galloway in Tucson regarding whether she should be transferred. The recollections of Drs. Galloway and Ossowski of the content of their conversation differ significantly.

x. By the time of her transport back to Tucson at 1:24 a.m. her blood pressure remained at 83/45, despite five hours of some treatment in the emergency room. Twenty six times her BP was abnormal at PIMC ER. On seven occasions, the systolic BP was in the 70's, reaching a low of 70 at 9:45 p.m., and she received 12 mg. of morphine between 9:00 p.m. and 9:50 p.m. at PIMC ER.

y. Mary Esther's condition prior to and upon transfer was described as "unstable" by all involved in her care at PIMC ER. Dr. Klein, Defendant's expert witness, who was not in attendance at PIMC ER, but reviewed the records and deposition testimo-

ny of the medical personnel in attendance, testified that she was "critically ill" when she arrived at PIMC ER and she was "critically ill" when she was transferred from PIMC ER. (TT 1422)

z. After her landing at the UMC, Mary Esther was admitted to the UMC/ICU between 2:30 and 2:40 a.m. She remained there past 5:00 a.m.

aa. At 5:00 a.m. she had a cardiac arrest. A code resuscitation began and she was noted to be resuscitated by 5:15 a.m.

bb. CT scans were accomplished on September 11 and September 14, 1994. They depicted profound generalized hypoxic damage of Mary Esther's brain.

cc. Both sides agreed that the cardiac arrest resulted in hypoxic, permanent brain damage to Mary Esther.

dd. Mary Esther was discharged from UMC on October 3, 1994. Since then she has been transferred to various care and treatment facilities, eventually resulting in her permanent and current placement at the Winslow Campus of Care.

2. The Four Standard Of Care Time Periods

Plaintiffs have divided the alleged liability of the Defendant for medical malpractice into four time periods: (1) the discharge of Mary Esther from UMC on September 8, 1994, (2) the emergency room care of her at PIMC ER late September 9 until early morning September 10, 1994, (3) the arrangements for, and her transport back to UMC on September 10, 1994, and (4) her care at UMC on September 10, 1994 when the cardiac arrest occurred. The Defendant has not adopted this division and claims it is designed only to facilitate Plaintiffs' adversarial purposes. The Court finds it useful because it provides ease of reference for addressing all of Plaintiffs' claims.

a. The 6–Day Discharge Decision of 9/8/94

1. The "first" standard of care time frame involves the allegation that Defendant's employee Dr. James Galloway fell below the applicable standard of care by discharging Mary Esther at 7:45 p.m. on September 8, 1994, six days after her mitral valve replacement surgery. It is the Defendant's position, based upon the testimony of its expert cardiologist, Dr. Klein, that such care did not fall below the standard of care. It is also the position of the Defendant that the UMC doctors were primarily responsible for the post-operative care including Mary Esther's discharge; and that the early discharge was not the proximate cause of her injuries.

2. The Court finds that Dr. Galloway fell below the standard of care in discharging her too early. The Court also finds that the doctors at UMC fell below the standard of care in their participation or failure to participate in Mary Esther's early discharge. The Court finds, however, that Dr. Galloway's responsibility was greater than that of the UMC doctors because he had the final responsibility to ensure that the essential regimen for her care was understood by her, and would be followed after discharge.

3. Mary Esther was admitted to UMC on September 1, 1994 by Dr. Galloway. Dr. Clifford, Mary Esther's cardiologist for many years, had referred her to Dr. Galloway because Dr. Clifford believed Dr. Galloway had a "systematic way" of caring

for Indian heart patients and "following them up." (Cliff. depo. 35–36). According to Dr. Clifford, Galloway's program was designed to ensure the continuity of care for cardiac Native Americans which was previously unavailable. Dr. Clifford testified that in the past the Indians would be "farm[ed] out" and we would "tend to lose the patients, lose track of them, so we couldn't follow them up very well." (Cliff. depo. 35–36) Dr. Clifford also testified that Mary Esther's case was a risky one: "There wasn't any doubt about it. It was a risky case." (Cliff. depo. 48) Dr. Clifford explained that this was primarily because Mary Esther had abused alcohol and had liver disease, and consequently she "would have to take anticoagulants, which adds a significant risk to somebody, particularly if they have a liver disease." (Cliff. depo. 48) Significantly, Dr. Clifford testified that he communicated his concerns to Dr. Galloway: "I would let [Dr. Galloway] know everything I knew and my ideas on the situation." (Cliff. depo. 50) Thus, Dr. Galloway was made aware of the risk factors involving Mary Esther's case, and significantly how important it was to ensure that the INR tests for determining blood coagulation were carefully planned for and completed after discharge. No evidence presented demonstrated that the UMC doctors were made specifically aware of this particular history of Mary Esther's case, provided directly by Dr. Clifford to Dr. Galloway.

4. On admission at 7:45 a.m. a "Patient Plan of Care" was completed. Question 16 on that Plan indicated that the patient "expected to be in the hospital two weeks". Nursing notes elsewhere in that "Plan of Care" repeated that the discharge date was "two weeks from now".

5. On postoperative day number one Mary Esther was transferred to the 6 East Ward in "stable" condition. A discharge summary noted: "... she will require follow up anticoagulation clinic ... in Mesa"

6. Dr. Galloway, followed Mary Esther throughout her entire stay at UMC. Dr. Galloway admitted that the INR test planned for September 9 was the "main reason" for keeping Mary Esther overnight at the hospital until September 9. The INR test could have been performed on the 9th at UMC. Dr. Galloway, however, moved the discharge up to the evening of September 8, 1994.

7. "Cardiac Rehab Phase I Activity Guidelines" were kept to track Mary Esther's post operative rehabilitation progress. These protocols listed "Six Steps" which the patient was supposed to meet prior to discharge. In comparing the nursing notes at pages 44–62 with these Guidelines on page 35 (of the pertinent records) Mary Esther had not accomplished these Six Steps before discharge. Dr. Galloway had also ordered a "stat renal" on 9/8/94 and an echocardiogram for 9/7/94, but they were not done before discharge.

8. On September 4, 1994, Mary Esther walked 200 ft. twice. On September 5, 1994 it appears she walked 200 ft. once. On September 6 at 2:00 p.m. she walked 500 feet once. On September 7 at 1:48 p.m. she walked 500 feet once (MR 58). On September 8, the morning of her discharge, there was no entry for any distances walked. Step Six in the "Cardiac Rehab Phase 1 Guidelines" reads:

"Ambulate 1000–2000 feet [before] discharge instructions."

9. The nursing notes established that when Mary Esther did ambulate 500 feet she had "dyspnea on exertion" [shortness of breath] (MR 35, TT 236–37). She never went 1000 feet without shortness of breath. (TT 237)

10. At trial, Dr. Galloway acknowledged that Mary Esther's medical records contained these the cardiac rehab guidelines (TT 130, MR 35). Dr. Galloway did not know whether Mary Esther met these "Guidelines" on the evening he discharged her and at trial he continued to be unaware of whether she met them. (TT 130–132, MR 58).

11. Dr. Galloway did ask the rehab professionals at UMC to increase her daily "activity challenges" the day before her discharge on the 7th. He admitted at trial, however, that he did not know if his instruction was ever carried out or what her response was if she ever was challenged (TT 150).

12. In response to questions by the Court, Dr. Galloway stated that it was not essential that Mary Esther follow the rehabilitation protocol because she could do what "we expect of a patient to be able to go home." (TT 208). The Court finds Dr. Galloway's opinion unpersuasive. First, Dr. Galloway did not offer alternative recognized objective and acceptable medical criteria for the discharge of a patient other than can she "walk around the hallway"; is she "able to care for herself"; is she able to "you know, dress herself," and "do things that are stable for a patient to go home." (TT 208) Second, applying his own criteria he ignored or failed to notice that when she "walked around the hallway" she had "dyspnea on exertion" [shortness of breath] the day before her discharge. (TT 237) Further, Dr. Galloway had specific knowledge of Mary Esther's history, in particular the risky nature of this operation for her, which necessitated that she obtain the INR test on September 9 and 10, 1994 to ensure she had no complications. Dr. Galloway testified that it was "very important" that she obtain the test on September 9, but he failed to establish a plan for her to accomplish his directive. (TT 209)

13. Dr. Galloway testified that his decision for early discharge was influenced by Mary Esther's desire to go home early, but the record shows that he failed to ensure that there was an adequate plan for her to obtain transportation for the administration of the "very important" INR test, and that she had adequate care at home after discharge. (TT 209) When asked what assurances he obtained from Mary Esther regarding getting her lab work taken care of, he repeatedly responded that "she had her family with her" and "she had transportation," and he "trusted that." (TT 99–100; 101; 143; 146; 173) He explained that he did not believe Mary Esther deceived him in this regard, (TT 143) but he admitted, if he had known that she had to travel by bus on a hot day in Phoenix for perhaps three to four hours to get the "very important" INR test, he would not have released her. (TT 209) There is nothing in the records nor did any witness corroborate Dr. Galloway's opinion that it was reasonable un-

der the circumstances to expect Mary Esther would be safely transported to the clinic for her labs on September 9 and 10. He never identified who assured him that he/she would take full responsibility for transporting her, and how that person would transport her for the tests. Dr. Galloway never inquired of the family members if they were going to stay at her home and care for her into the weekend. (TT 144). He did not seek "assurances" from the family members: "I did not. I talked to Mary Esther instead," the patient who was sick, and whose capacity for objective judgment was impaired by her intense desire to go home. (TT 191–192).

14. When the three family members arrived at UMC in Tucson, Mary Esther informed them that she was going home "the following day"(the 9th), but that she did not want her husband to take her home. (Nelson video depo.)

15. They decided to take Mary Esther home but, Rena Nelson told Mary Esther that she needed to go back to Winslow because she had to be at work the next morning. (Nelson video depo. 15–25, 35–36)

16. Dr. Galloway admitted that he knew that all three family members present when she was discharged "were family at a distance, yes." "I knew they lived up in the northern part of the state, I believe" (TT 172) Nelson, the driver, said she went to get her car and did not hear or see any final communications with Dr. Galloway or any medical personnel if any occurred.

17. Dr. Galloway also admitted he made a conscious decision to exclude the social services professionals at UMC from the discharge decision and plan for Mary Esther on September 8. He explained that he knew from past experience that UMC social services "didn't have a clue" how to deal with Native Americans. He avoided their involvement because "they weren't very helpful." But Dr. Galloway agreed that any perceived inadequacy of the social services department should have resulted in more involvement on his part, not less, to ensure Mary Esther was transported to get the INR test, and for her care throughout the weekend. (TT 322, 325–32)

18. Jana Bosse, a qualified nurse who at the time she testified was operations manager for a critical care unit which included progressive care and cardiovascular ICU, explained that discharge decisions are not left to the patient, that it is a team effort with the physician discussing with the family what must be accomplished once she gets home, and who is going to be there to help out. (TT 239) For Mary Esther, it was important to have taken account of the ages of her children, how they would be cared for, and the establishment of a specific plan of how transportation for the INR tests would be arranged. (TT 240–41) Dr. Galloway failed to accomplish this for Mary Esther with any reliable family members, present or not present, at the time of her discharge.

19. It was even more imperative for Dr. Galloway to effectively establish with the family members present at the time of discharge a clear plan for Mary Esther's care and transportation, because Dr. Galloway did not communicate with her

husband, Troy Nunsuch, because he apparently did not have confidence that Mr. Nunsuch would accept and assume responsibility as her care giver. Dr. Galloway testified that "there had been some issues between her and her spouse." Dr. Klein referred to it as "marital discord." (TT 1410) Dr. Galloway said Troy was only "around intermittently" and he did not even participate in the decision for her to have the surgery. (TT 121–2) Dr. Galloway's impression about Troy Nunsuch, and Mary Esther's relationship with him, was corroborated by other evidence. Dr. Clifford testified that her husband was only around "some of the time" during his treatment of Mary Esther and, when Mary Esther returned home on September 8 after surgery, according to Rena Nelson, Mary Esther slept on a sofa and Troy Nunsuch slept in a bedroom. (Nelson video depo.) The next morning Troy Nunsuch took the family's only vehicle, left Mary Esther alone with very young children, without a care giver, and to take a bus from Mesa to Phoenix and back on a hot day for the essential INR test. (Nelson video dep.; See **DAMAGES** at 50.)

20. Dr. Wohlgelernter, a very qualified cardiologist, testifying for the Plaintiffs said that it was below the standard of care to discharge Mary Esther from UMC on September 8, 1994 (TT 1465). He stated that even if she assured Dr. Galloway that she had a ride or could get a ride for her INR test, the discharge would still have been inappropriate because it placed an "excessive burden" on her to travel, even by car, just six days after her open heart surgery. (TT 1478)

"[E]ven if there was an assurance that transportation was available to take her from home all the way . . . to Phoenix Indian Medical Center, that's still an unacceptable situation for a patient who has just . . . had open heart surgery a few days before. I would never allow my patient to be put in that predicament, of having to travel great distances to get a blood test. I would either have a situation where a visiting nurse can draw the blood sample at the patient's home, or if there is a nearby laboratory station where the blood can be obtained without any kind of lengthy travel, that's acceptable." (TT 1478)

21. Defendant's expert on standard of care, Dr. Neil Klein, also a very qualified cardiologist, issued a report on July 30, 1998 and concluded "[t]he patient's discharge instructions and arrangement for follow up care at the Phoenix Indian Medical Center (PIMC) was appropriate, as were the discharge medications." (EX 202) He provided little elaboration at trial for this opinion, other than to state that in his practice patients who have heart surgery, whether bypass or valve replacements, are in the hospital only between five to seven days. (TT 1343) He also testified that he was not concerned that she had not completed all six steps of the cardiac rehab guidelines, though he admitted that these guidelines were similar to the ones used at St. Joseph's hospital where he admits his cardiac patients. (TT 1406) It is also significant that Dr. Klein did not recall the longest distance completed by Mary Esther before discharge, which was only 500 feet, (TT 1404) and that one

day prior to her discharge walking 500 feet produced "dyspnea on exertion." (TT 1407) He testified "That I don't remember." (TT 1407)

22. The UMC cardiac surgeons did not deny involvement in, and at least some responsibility for the decision to discharge Mary Esther. Dr. Tsen testified that the decision was made by a team including Dr. Sethi, Dr. Tsen, Dr. Gordon and Dr. Galloway. (Tsen depo. 6). Dr. Gordon testified that discharge was always a team effort "but as residents, we understood that if Dr. Galloway made the recommendation we were to follow it" and the "follow-up was clearly dictated by Dr. Galloway." (Gordon depo. 87, 99). Dr. Sethi, whose testimony was remarkable for its inconsistencies, did testify that it was customary to obtain approval from Dr. Galloway for the medical center's patients and that the medical record read "Plan discharge Friday, if ok with Dr. Galloway." (Sethi depo. 36–37). As a team, the surgeons performing this surgery, which was risky for Mary Esther, had the responsibility to discharge her only when she was ready. As such, it was their joint responsibility with Dr. Galloway to ensure that she met the cardio rehab guidelines, or other medically objective and acceptable guidelines for appropriate discharge. They had, however, good and sufficient reason to rely on Dr. Galloway for an appropriate and effective plan for her care upon discharge and for her transportation to PIMC for the INR test. Dr. Galloway admitted that the UMC doctors had agreed to an "early" discharge of Mary Esther on the condition that it was approved by him, and that it was his final responsibility to plan the discharge of her, because of the "follow-up issues that he was responsible for before discharge." (TT 139–40) Moreover, it is undisputed that Dr. Clifford specifically referred Mary Esther to Dr. Galloway because of what Dr. Clifford understood was Dr. Galloway's capacity to provide the bridge for Indian heart patients with Anglo–American medicine, which required "systematic care" for them and "follow up." (Cliff. depo. 35–37)

23. The Defendant, through its employee Dr. Galloway, and the UMC cardiac surgeons fell below the standard of care by discharging Mary Esther on September 8, 1994 before ensuring that Mary Esther had met the cardiac rehab activity guidelines before her release, or other objective medical guidelines applicable to the discharge of cardiac patients after surgery.

24. Additionally, the Defendant independently, through its employee Dr. Galloway, fell below the standard of care by discharging Mary Esther on September 8, 1994 in that (1) his plan for discharge required her to travel by car for a required medical test, six days after open heart surgery, which placed an excessive burden on her; (2) by being unduly influenced in his discharge decision by Mary Esther, a sick patient, whose judgment was compromised because she was desperate to return home; (3) by failing to establish with reliable family members an effective and adequate plan for her care at home after discharge, and for her transportation to get the necessary medical test, when he chose not to

rely on UMC social services, or her husband to ensure that she would be cared for and transported.

25. Plaintiffs have established her injuries would have been avoided if Mary Esther had not been discharged on September 8, 1994. (TT 1478–79; 328–29) The Court finds that if Dr. Galloway and the UMC doctors had not failed to meet the standard of care in discharging Mary Esther, her injuries could have been prevented and their failure was a proximate cause of Mary Esther's injuries occurring on September 10, 1994.

b. The Care at PIMC ER

1. This second standard of care time frame addresses whether the PIMC ER nurses and physicians who provided care to Mary Esther between 8:30 p.m. and approximately 1:30 a.m. on September 9 and 10 met the standard of care.

2. The Plaintiffs claim, in part, a "failure to act and react" breach of the standard of care rather than a failure to diagnose. The Plaintiffs have focused on a variety of features of the care given, or which PIMC ER failed to give, including (1) failure to adequately take basic vitals and re-administer appropriate testing, (2) failure to obtain proper urine evaluations, (3) the low amount of fluids given and treatment for volume depletion, (4) the failure of the physicians to appropriately engage in differential diagnosis, and (5) the improper administration of medications, that is, morphine sulfate and dopamine. The Defendant disputed whether the care fell below the required standard arguing that the treatment was appropriate.

3. The Court finds that Defendant, through its employees, fell below the standard of care in its treatment and failure to treat Mary Esther on September 9 and 10, 1994 at PIMC ER.

4. It is undisputed that upon her arrival the care givers at PIMC ER ascertained that Mary Esther was critically ill, whatever the cause. The care givers also quickly discerned that she had very low blood pressure; she needed more fluids and she was given some. They knew she had recent heart surgery and pain which was determined to be, and was recorded as "incisional pain". Although not recorded in any of the medical records, both Dr. Gayton and Dr. Ossowski testified that they agreed an appropriate diagnosis for Mary Esther might have been hypovolema (inadequate fluids). Doctors Gayton and Ossowski also testified that they thought much more serious possibilities were also present such as cardiac tamponade (excess pericardial fluid causing compression of the heart, limiting the filling of the heart so cardiac output falls and blood pressure falls); pulmonary embolism (a blood clot in the lungs), sepsis (infection throughout the blood system). (TT 909; 920; 923–24; 1473–75).

5. Plaintiffs' expert, Dr. Wohlgelernter agreed that at the outset these more serious possible diagnoses, other than hypovolema, had some viability. His criticism of the physicians was that after they identified these potentials they failed to actively engage in testing and analysis to rule them in or out, and if they had they would have concluded she was hypovolemic and properly treated her, which would have obviated the cardiac arrest. Instead, after the initial

diagnosis, testing was conducted, pain was treated with morphine sulfate, and then she received dopamine, but there was never a positive response to her very low blood pressure. Again, rather than change the plan and course of treatment, retest, and re-evaluate, the physicians allowed Mary Esther to languish in ER for five hours and her condition deteriorated. Her blood pressure became dangerously low, and her last recorded pulse rate before she was transported was 139 "which is an alarmingly and frighteningly high number." (TT 331)

6. The fundamental breach of the standard of care was not that they failed to diagnose hypovolemia, because they did diagnose it. It was that they failed in so many respects to properly care for and treat Mary Esther, as a critically ill patient. She went to PIMC ER because it was an emergency room. "It is called an emergency room for a reason." (TT 334) Care givers in an emergency room must respond with a sense of urgency. PIMC ER did not, and their mistakes and omissions in violation of the standard of care are specifically addressed below.

The Initial History and Treatment Plan of Dr. Gayton Followed by Dr. Ossowski.

7. Dr. Gayton saw Mary Esther initially and obtained data via a chest x-ray, an EKG, an ABG, and a blood chemistry study and started the morphine medication. (TT 413–414).

8. Dr. Ossowski agreed that PIMC ER first contacted him to come see Mary Esther around 10:00 p.m., (TT 399, MR 66) but his arrival and/or involvement in Mary Esther's care did not begin until 11:55 p.m. (TT 394, MR 69) There was no accept-able explanation for the almost two hour delay between the call to Dr. Ossowski and his arrival on the scene. (TT 917) He speculated that he was treating another patient. (TT 916 918) Mary Esther's vitals demonstrated she was in critical condition when she arrived at the ER, and they had not improved when Dr. Ossowski was called. Dr. Ossowski should have arrived to care for her immediately, or found a competent substitute to attend to her on an urgent basis.

9. Moreover, when Ossowski arrived he should have been alarmed by what he found. The blood chemistry studies warned of a borderline $CO_2$ from 8:55 p.m. These were never repeated; there had been no urinalysis; no foley catheter had been placed; no orthostatic blood pressures had been obtained; there was no history of fluid intake or output. (TT 414–423) Dr. Ossowski even had to add significant findings into the emergency room record which, prior to his arrival at midnight, had been missing. He wrote "hypotension" next to low pressure; he wrote "recent mitral valve replacement;" he wrote "anemia" (TT 397. MR 66). He ordered the "foley catheter." He stopped the morphine sulfate. He ordered an increase in the rate of supplemental oxygen. He initiated the calls to Dr. Galloway. He called for a helicopter. (TT 398, MR 66–71) Finally, AirEvac put her on 100% oxygen by mask during her transport to UMC. (MR 82)

10. Dr. Ossowski did not write the ER entry about the long bus ride (TT 396, MR 66). He did not know at trial who did. (TT 399–400) Dr. Ossowski could not recall if the "lengthy bus ride" notation was

added to the emergency room record after his arrival at 11:55 p.m. (TT 423) and the recorded history reflected no inquiry directed to Mary Esther about consumption of fluids that day.

11. An accurate history should have been taken under the appropriate standard of care and the standard of care history should have resulted in a more professional, timely, and an adequate plan of treatment throughout the time she was at PIMC ER.

The Importance of Urine Evaluation.

12. A urinalysis is extremely important in determining an etiology for low blood pressure (TT 1471). Measuring specific gravity in the urine determines if a patient is hypovolemic.

13. There was a four and one-half hour delay in placing a foley catheter to capture and test urine characteristics and output (TT 256). No urine was ever captured or tested at PIMC ER. (MR 70)

14. Nurse Santiago said a urinalysis was supposed to be done (TT 528–529). In fact, she agreed without objection that the "standard of care" in 1994 at PIMC ER required a urinalysis which would include a specific gravity (TT 547).

15. Measuring urine output and obtaining a urinalysis is so "basic" in clinical settings such as this, that it is one of the earliest things taught in nursing school for assessing a patient in the ER (TT 255).

16. A table for volume depletion's key findings in Saunders Manual of Medical Practice, 2nd Edition was admitted and listed "tachycardia, orthostatic changes, urine electrolytes… and specific gravity" as the "most reliable signs of volume depletion." If diagnosis is not conclusive, the textbook required serial hematocrits and urine studies. Neither was undertaken in this case. Under the heading entitled "Warning" that same text further stated that the most common treatment mistakes are: (1) "inadequate rate and volume" of fluid replacement; (2) failure to repeat evaluations and lab work frequently enough; and (3) failure to anticipate changes in electrolyte status.

17. Dr. Gayton responded to these criticisms by minimizing the relevance of urine, urine output, or a urinalysis in the overall work-up. None of the Defendants' other employees; their expert; or a medical text or resource supported Dr. Gayton's dismissal of urine evaluation.

18. Dr. Ossowski said urine was important enough to be monitored and evaluated and he ordered the foley catheter. Dr. Klein admitted that he was unaware that no urinalysis had been performed and this fact was relevant to his opinion. (TT 1401–1402). Dr. Klein conceded that he testified at the time of his deposition: "I did recognize that a urinalysis would be the make or break decision of the volume status of the patient." (Klein deposition, pg. 65; TT 1401–1402)

19. At PIMC ER there was no monitoring of urinary output, or urinalysis, and the failure to do so fell below the standard of care. (TT 1471).

The Basics of Vital Signs, Lab Work, Serial Testing.

20. There was a failure at PIMC ER to obtain orthostatic blood pressures (TT 252); a failure to obtain or monitor complete vital signs; a fail-

ure to initiate or repeat certain blood gas or blood chemistry studies. (TT 258)

21. The rule at PIMC ER, as conceded by its nurses, was to obtain "orthostatic" pressures meaning serial blood pressures, and they were to be taken within a prescribed period of time. Orthostatics are very basic medicine, and taking orthostatic readings required no special equipment. (TT 577–582)

22. The Court agrees with Plaintiffs' expert that obtaining orthostatic blood pressures was "mandatory" under the circumstances presented by Mary Esther's health status, and that they would have been very helpful in determining her volume status. (TT 1472)

23. The administration of supplemental oxygen to Mary Esther who was pale and dehydrated with a very low hematocrit and hemoglobin, demonstrated confusion, lack of teamwork and a failure of communication. Dr. Gayton's **initial** order was written for 4 **L/min**. (MR 66). Within minutes, Nurse Linville started oxygen at 3 **L/min**. (MR 67) Within five to ten minutes later, and without explanation or rationale, Nurse Santiago changed the supplemental oxygen to 2 **L/min**. Dr. Ossowski then changed it back. (MR 66, 71)

24. The care givers also failed to reevaluate and investigate her significantly elevating pulse rate. (TT 335–336) Her pulse rate went from 108 at 8:30 p.m. to 139 before her air transport. (TT 583–84)

25. Temperature is also a vital sign and low temperature ( Mary Esther's was 96.5) is often seen in hypovolemic patients (TT 251). Her temperature should have been re-peated, but was not until she was on AirEvac. (TT 251) Why temperature or respiratory rates (both of which were abnormal early in the ER) were not taken was again "unknown" to the PIMC ER nurses. (TT 584)

26. Arterial blood gases are more definitive of health status than pulse oximetry. (TT 273) They were not repeated.

Fluids and Treatment for Volume Depletion.

27. Significantly, Dr. Galloway testified that Mary Esther was not hypovolemic at the time of her discharge on the evening of September 8, 1994. (TT 142).

28. It is undisputed that a problem for Mary Esther when she arrived at PIMC ER was her hypotension. (TT 318)

29. The Court finds that the evidence established that the fundamental cause of her hypotension was inadequate body fluid, or hypovolemia. (TT 318; See **CAUSATION**, *infra.* at 46).

30. Doctors Wohlgelernter, Fisk, Copeland, Ossowski and Klein all said that hypovolemia "was in the mix" of her problems at PIMC ER. (TT 1414–1415; 927) The nurses at PIMC ER also knew she needed fluids, but the rate and amount was left to the physicians to order. (TT 444) Dr. Ossowski characterized the amount of fluids Mary Esther received as "small" or "slight" in the aggregate, though he claimed that he did not order additional fluids because he thought she had possible heart problems. (TT 444–45)

31. In deposition, Dr. Klein admitted that Mary Esther was being treated at PIMC ER "for hypovolemia." (TT 1382–1383) At trial, he testified that hypovolemia was "possible," (TT 1382–83) and that he was aware that doctors Gordon, Fisk, Ossowski, Wohlgelernter found her hypovolemic at PIMC ER. (TT 1415). His opinion that the fluids she received at PIMC ER were adequate was simply that "[t]he initial evaluation of the physician in the emergency room was to initially gave the patient a bolus of fluids, which was, the records show 250 cc's of saline. Or a 200 cc bolus, I'm sorry, 200 cc bolus of saline as initial attempt at volume expansion. Fluids were then continued at 120 cc's per hour. There was a subsequent second bolus of 200 cc's. In emergency room setting with a very complex, ill patient with *multiple medical problems,* I feel this was an adequate *attempt at hydration.*" (TT 1367) (emphasis added) First, his opinion appears qualified by his choice of the phrase "attempt at hydration" which is precisely the position of Plaintiffs' expert, i.e., there was merely an attempt to hydrate Mary Esther at PIMC ER, but it was never accomplished because she did not receive enough fluids. (TT 317–322) Further, Dr. Klein never elaborated on his initial report or in his testimony at trial on what he meant by Mary Esther's "multiple medical problems." In particular, he did not refer to any evidence demonstrating, or even inferring, that the medical personnel at PIMC ER were aware of, and had identified, the same "multiple medical problems" he had retrospectively identified and, most importantly, whether her volume depletion was assessed and addressed in conjunction with each of the identified "multiple medical problems."

32. The Court finds, as did Plaintiff's expert, that assuming Mary Esther received 1200 cc's of fluid, that amount was below the standard of care in two areas: (1) it was insufficient in amount; and (2) the rate it was given was too slow. Had 1200 cc's been given the first hour instead of over four hours, it would have been therapeutic (TT 319). This opinion finds support in Guyton's Human Physiology and Mechanisms of Disease, Fifth Edition, demonstrating that a daily loss of water (in milliliters) is almost triple the total amount of fluid given to Mary Esther throughout her treatment at PIMC ER. The daily amount also does not take account of Mary Esther's bus ride that day, and other variables such as body weight, recent heart surgery and young children. (EX 47) Also in the Saunders Textbook, Manual of Medical Practice, the key findings for imbalance due to volume depletion were either all present or could have been discerned from Mary Esther: tachycardia, orthostatic changes, urine electrolytes, and specific gravity (TT 1418). The textbook continues "[t]he most common mistakes [diagnostically] are:

• Inadequate rate and volume of saline replacement (underrating the situation);

• Neglecting to re-evaluate the patient's status and laboratory findings frequently enough;

● Failure to anticipate changes in fluid and electrolyte status."

Manual of Medical Practice, pg. 899. (EX 47) Finally, the ACLS (Advanced Cardiac Life Support) provided evidence on the standard of care. As a "basic text" it listed the basics for dealing with the hypotensive patient and is considered the "backbone of treatment of acute cardiac and critical care patients." (TT 1476)

33. There were other available means at PIMC ER to determine Mary Esther's volume status on September 9, 1994 and there was staff capable of inserting an arterial pressure line, a central venous pressure tubing (CVP) and a swan ganz catheter (TT 446, 573–74, 343–44) They had all the necessary equipment to determine volume depletion, but they were not used. (TT 446–447)

34. Dr. Ossowski attempted to explain his failure to administer these tests with his concern that she might have had heart failure, or "tamponade" (TT 458) or a pulmonary embolus, or that she could have been septic. He added there are "known complications" with the central line, including "a lung collapse or a pneumothorax" and an "arterial line is not without complication, either" he opined. (TT 419) He admitted, however, that there was someone proficient and available that night at PIMC ER to have placed these lines, including Dr. Gayton. (TT 447) He also readily conceded that sepsis was highly unlikely, (TT 920) and that no evidence emerged that she had a myocardial infarction. (TT 915) Finally, an echocardiogram would have ruled in or out the other possible heart ailments, but Dr. Ossowski determined that the equipment was not immediately available in PIMC ER or PIMC ICU. Having so concluded, it is untenable that he then ordered this very sick patient transported for one and one-half hours to Tucson.

35. Finally, the Court agrees with Plaintiffs' expert that even in the presence of the other differential diagnoses, more fluids should have been given until the vital signs recovered. (TT 374–375)

The Failure of Differential Diagnosis.

36. The most tenable possible defense to the criticism of the care given at PIMC ER is they had decided, through the process of differential diagnosis, that there were medical reasons for not doing the things that Plaintiffs claim should have been done.

37. It is beyond peradventure that intrinsic to any emergency room is the unpredictability of an accurate diagnosis because of the absence of sufficient history about the patient, the rapidly transforming symptoms of a patient, and the often narrow window of time in which the care givers must react.

38. The Court finds that the care givers at PIMC ER on September 9 and 10 initially engaged in appropriate differential diagnosis, but as Plaintiffs' expert discerned, they failed to continue to engage in necessary analysis, and failed to take appropriate action to improve Mary Esther's condition. She arrived at PIMC ER in critical condition; lingered in the ER for five hours before she was transferred when her status was significantly in peril. It is important that Defendant's expert, Dr. Klein, characterized Mary Esther as a "very complex, ill pa-

tient" who was "critical" and "hypotensive" when she arrived at PIMC ER and she was "critical" and "hypotensive" when she was transported out five hours later. (TT 1367; 1422) Dr. Wohlgelernter correctly observed that the "differential diagnosis [at PIMC ER] is something that was not spelled out."

39. The primary conclusion Dr. Gayton made upon his initial exam was "this was all complications from surgery." (TT 708, 1. 16–18) But the recent heart surgery produced incisional chest pain (TT 380), and Dr. Ossowski understood that the chest pain was "incisional chest pain" from the surgery one week prior (TT 452).

40. Dr. Ossowski explained that at midnight when he made his call to transport Mary Esther, it was "unclear what the diagnosis was, whether she had some heart failure; whether she had cardiac tamponade; whether she had another complication related to her surgery." (TT 426) But this analysis does not appear anywhere in Mary Esther's medical records and, more important, there was no explanation at trial of what led to these assumptions and when, during the five hours at PIMC ER, they were reached.

41. The Court recognizes that absence of any possible alternative diagnosis in the medical records does not foreclose the possibility that differentials were seriously entertained and by entertaining them, certain treatments, tests or medical interventions were appropriately postponed due to other diagnostic possibilities. But the Court finds that there should have been an immediate response to, and more intensive care given by PIMC ER, this critically ill patient.

42. Dr. Wohlgelernter opined, and the Court agrees, that Dr. Gayton and Dr. Ossowski appeared uncertain or confused regarding what was causing the low blood pressure. (TT 1472) He testified and the Court agrees that an effective differential diagnosis requires a doctor "to quickly and efficiently rule out the possibilities that don't apply and to finally get to the diagnosis that clearly applies," and once that diagnosis is reached "it needed to be treated properly and effectively." (TT 1475) He further explained an echocardiogram would have provided much needed information to rule out or in any potential heart problems. (TT 372–73) Dr. Ossowski appeared to recognize this, but stated that he "couldn't have gotten one in the night; I couldn't have gotten one over the weekend if the patient stayed at the PIMC." (TT 427) Assuming appropriate equipment was unavailable at PIMC ER to evaluate this critically ill patient, an immediate response, including the possibility of an immediate transfer to a facility with the equipment to perform the procedure should have been accomplished. Moreover, a local cardiologist was not called. Neither Dr. Ossowski or Dr. Gayton called Dr. Clifford, Mary Esther's cardiologist, for consultation. Dr. Ossowski explained that he was not called because he was not on call. (TT 427). Dr. Clifford testified, however, that though he was not officially on call, "they called [him] occasionally" and if he was "around [he] would have been happy to respond." (Cliff. depo. 87)

Finally, Dr. Wohlgelernter explained that if more serious heart problems were seriously considered, a physical examination of Mary Esther should have ruled in or out cardiac tamponade; there was nothing in the record to support a pulmonary embolism; and an x-ray would have clarified whether she was suffering from pneumothorax. (TT 1473–1474) He testified, and the Court agrees, that Dr. Gayton and Dr. Ossowski had reached a stage of "diagnostic paralysis." (TT 1475) Meanwhile, Mary Esther's fluid deficiency worsened over the many hours she was kept at PIMC ER without proper treatment.

43. Defendant's expert, Dr. Klein was not critical of the medical care at PIMC ER. In his report prepared in 1998 Dr. Klein synoptically stated "[o]n September 9, 1994, the day following her discharge from UMC, the patient was seen at the PIMC emergency room with complications of right sided chest pain and evidence of moderate hypotension and mild sinus tachycardia. It is my opinion that the *initial evaluation* at PIMC, including chest x-rays, arterial blood gases and blood tests, were appropriate. The *initial treatment* of this patient at PIMC, consisting of fluid expansion and subsequent isotopic support with dopamine supplemented with boluses of morphine for pain control, were within the standard of care." (emphasis added)(EX. 202). Dr. Klein's opinion, however, appears to be confined to analysis of the *initial* treatment at PIMC ER which again is not inconsistent with Dr. Wohlgelernter's opinion. Moreover, Dr. Klein did not elaborate much on this opinion in his report at trial; significantly, he did not point to the bases and data supporting his conclusion. He summarily opined, "I believe that the evaluation by the physicians' initial attempts at treatment, subsequent then referral to a tertiary care center, were all in line with what would be expected of physicians in this community." (TT 1365).

44. The Court finds that appropriate differential diagnoses was not accomplished by PIMC ER, and though other diagnostic theories may have existed, Defendant's employees admitted that hypovolemia was always on the list, and they never ruled it out. The Court finds that Dr. Wohlgelernter correctly concluded that "the problem was hypotension, low blood pressure, due to hypovolemia, inadequate body fluids, inadequate circulating blood volume. This was a correctable problem. But four hours later, when she was transported via medical helicopter to UMC, not only was [she] worsened, [but her] clinical condition had deteriorated, [and] some of the interventions applied by the medical staff at PIMC, in fact, exacerbated her condition and contributed to her deterioration." (TT 330; See CAUSATION at 46) Once hypovolemia was identified by PIMC ER, and after some treatment was initiated, when Mary Esther failed to respond to the fluids given, it fell below the standard of care for PIMC ER to not react and properly increase the fluid intake.

Morphine Sulfate and Dopamine.

45. The evidence established that Mary Esther's low blood pressure was

exacerbated by the presence of a vasodilator, morphine sulfate. It was ordered by Dr. Gayton during his initial physical examination for "chest pain." A total of 12 mg. was given within 50 minutes between 9:00 p.m. and 9:40 p.m. (14 mg. total was given by 10:40 p.m.). It was then discontinued by Dr. Ossowski at about midnight. (MR 66–71, TT 387; 384; 329–331)

46. The Advanced Cardiac Life Support (ACLS) textbook studied by PIMC employees in their training and recertifications clearly states not to give morphine to a volume depleted patient (TT 1446–1447). Plaintiffs and Defendant both cited Goodman & Gilman's text, The Pharmacological Basics of Therapeutics, 9th Edition which reflects that: "Patients with reduced blood volume are considerably more susceptible to the hypotensive effects of morphine... and these agents must be used cautiously in patients with hypotension from any cause." (Pg. 536; EX 203)

47. The nurses agreed that the morphine violated the ALCS. (TT 586) Nurse Linville, in her career, had never seen "anywhere near" 14 mg of morphine given to a patient with chest wall pain. (TT 594) Nurse Santiago admitted that she was taught that giving 14 mg. of morphine to a patient with hypotension could be a "lethal dose", and that 10 mg. was the maximum dose. (TT 549–50)

48. Dr. Ossowski acknowledged that he had read the depositions of the UMC doctors Copeland, Tsen and Gordon who all "... thought that too much morphine sulfate had been given." (TT 451) Dr. Wohlgelernter, Dr. Fisk and Jana Bosse,

R.N., all experts for the Plaintiffs from three different specialities, criticized the use and amount of the morphine given. (TT 261–266; 329–331; 482)

49. The Court finds that giving morphine and the amount given to Mary Esther fell below the standard of care. The Court also finds that the dopamine given by Dr. Ossowski at approximately 12:15 a.m. until Mary Esther's arrival at UMC at 2:15 a.m. was below the standard of care.

50. Dr. Ossowski admitted that in a hypotensive, potentially low volume patient, a vasoconstrictive agent like dopamine is not initiated until fluid deficiencies have been corrected. (TT 927) Dr. Galloway agreed, testifying that dopamine should be given only after a patient is "tanked up on fluids." (TT 113–14)

51. Finally, in support of the standard of care given Mary Esther at PIMC ER, Defendant argued by inference that PIMC ER was not as well equipped as other hospitals to treat Mary Esther. The Court finds, however, that the liability here relates to basics of patient care, not specialized surgeries or state of the art technical equipment. The standard of care assumes a "similarly situated health care professional." Defendant cannot minimize the standard of care between "like circumstances" to a legal nullity. A.R.S. § 12–563. The doctors and nurses at PIMC ER lacked nothing in equipment or training to treat low blood pressure or volume depletion.

52. The Court finds the Defendant, at PIMC ER, on September 9 and 10, 1994 fell below the standard of care

in treating Mary Esther in that the care givers (1) failed to quickly and properly react over a five hour period of time; (2) failed to properly obtain and monitor vital signs and other tests; (3) failed to properly obtain urinalysis; (4) failed to provide adequate fluids for treatment of volume depletion; (5) failed to properly engage in differential diagnosis; and (6) administered an excessive amount of morphine sulfate, and administered dopamine.

53. The Court finds that the breach of the standard of care was the proximate cause of Mary Esther's injuries. (See **CAUSATION** at 46.)

c. The Telephone Consult Near Midnight Regarding Mary Esther's Transfer, and her Transfer

1. The "third" standard of care time frame concerned allegations that poor communication caused a critical and costly medical delay. Dr. Ossowski, consulted telephonically with Dr. Galloway in Tucson, who was awakened at home sometime after midnight on September 9–10. This call was followed by another serious failure by Dr. Galloway to adequately communicate the critical status and medical condition of Mary Esther to Dr. Gordon at UMC. (Gordon depo. 53; TT 115)

2. Plaintiffs contend, and the Court agrees, that this standard of care was violated by Defendant's employees, Ossowski and Galloway.

3. When Dr. Ossowski assumed Mary Esther's care from Dr. Gayton near 11:55 p.m. he considered her condition critical, and made some changes in her treatment. He discontinued the morphine, ordered a Foley catheter, increased the rate of oxygen, and found Dr. Galloway's home telephone number to call him. (MR 66–71) But there was no decision to contact another area hospital or Phoenix area cardiologist; to repeat arterial blood gases; to get orthostatic blood pressures; to start a central line; and to increase the rate or volume of fluids by IV. Yet, he decided that there was sufficient time for this critically ill patient to be returned to Tucson by AirEvac, where the UMC doctors, blinded by the failure to receive an accurate communication of Mary Esther's status, treated her as if she had been originally brought to them at 8:30 p.m. the day before when she was first admitted to PIMC ER. (TT 109–114)

4. Somewhere over two hours were consumed between the near midnight phone call and the 2:15 a.m. landing at UMC. That time wasted two of the last three hours before Mary Esther's cardiac arrest became "inescapable" around 3:30 a.m. to 4:00 a.m. (MR 90, 94; TT 362)

5. Significantly, it is clear there was a very serious miscommunication between what Dr. Ossowski claims he said to Dr. Galloway and what Dr. Galloway claims he heard in their midnight conversation. Dr. Galloway testified variously, that Dr. Ossowski described Mary Esther as "stable but in pain" (TT 186), "complaining of pain, and a blood pressure of, oh, approximately 95," and "they were concerned about her." (TT 187–88). Dr. Galloway had the "impression" from Dr. Ossowski that she was "stable, labs good, chest x-ray unchanged" and "everything looks really good on this patient." ( TT 191); "[T]he issue was not whether she was ill or not. She certainly was ill. In the relative

scheme of things, she was fairly relatively stable." (TT 195) "I'm not sure if [Ossowski] used the word (unstable) or not" but Galloway got the impression from the call "she was stable." (TT 198); "[Ossowski] basically said [to Galloway]... I'm very concerned about this patient. Things look pretty good right now. We've got her blood pressure back up and things are—are okay right now, but I'm but we need to move quickly. And I don't believe that he used to term critically unstable." (TT 206–7). Galloway remembered Ossowski told him "[o]n examination she had an exquisitely tender chest wall near the incision ... he felt that she should be transported back to the surgeons ... who did the operation ... if there's any complications you go to the person that did the operation to re-evaluate since they know you best." (TT 111)

6. In significant contrast, however, when asked at trial whether "doing fairly good, labs are good, chemistry's good, vitals were all stable, she had two to three milligrams aggregate on board, but because her blood pressures were lowish, What do you think, Doctor? Maybe we should send her back to you" was an accurate impression of what Ossowski thought he conveyed to Galloway in their call, Ossowski responded, "No." (TT 424–5). Dr. Ossowski believed that he communicated to Galloway, "that [she] was a seriously ill patient." (TT 425). Dr. Ossowski thought he had created the impression that she was "critically ill" by telling Galloway "what the range of her blood pressure was and the pulse, and that [PIMC ER] had given her this amount of fluids and ... started her on Dopamine and she wasn't—hadn't completely respond-

ed or hadn't responded." (TT 428–9) During trial Dr. Ossowski was reminded of his deposition testimony and whether a nurse's assessment of Mary Esther as "critically ill" accurately characterized her condition, and he responded "Yes."

7. Dr. Galloway readily admitted that if Ossowski intended to communicate that Mary Esther was "unstable" but Galloway did not interpret the communication in that manner, their "communication" was "ineffective." (TT 198). Dr. Ossowski, however, was not as inclined to embrace this characterization of the inconsistencies in their two versions of the phone conversation. (TT 429–30).

8. The Court finds it unnecessary to resolve who is credible, or which version is accurate. Perhaps, honest memories can differ, but the Court finds that this failure to communicate is indefensible, and clearly fell below the standard of care.

9. The Court finds that it should be obvious to a lay person that doctors transferring a critically ill patient must effectively, accurately, and comprehensively communicate the status of the patient. See *Kalar v. Maccollum*, 17 Ariz.App. 176, 496 P.2d 602, 604 (1972). Plaintiffs also offered expert testimony on this issue. Dr. Wohlgelernter confirmed that it was "absolutely necessary" for the referring care giver to communicate to the receiving physician the "critical" nature of Mary Esther's condition, including the relevant specifics of the problems ongoing in the ER (TT 346). Another expert testified that clear and accurate information about any medications should have been communicated by

one physician to another when the transfer was made. (TT 189–190).

10. Dr. Klein, Defendant's expert, based on a hypothetical closely resembling the inconsistent versions of the phone call between doctors Ossowski and Galloway stated that each doctor's "recollection is in conflict." (TT 1433). Dr. Klein agreed this was a consult over a "critically ill," "unstable" patient, and both doctors had an obligation to be clear in their communications. *Id.* Dr. Klein conceded that "patient safety," "patient trust," "patient protection" are the physician's primary concern. (TT 1436).

11. Finally, it is important to note that even if the Court accepts Dr. Galloway's version of his conversation with Dr. Ossowski, Dr. Galloway did not do what Dr. Ossowski asked of him, and what Dr. Galloway agreed should have been done, which was to return her to *the surgeon* who had performed her surgery. Dr. Galloway unambiguously testified that Dr. Ossowski told him "that she should be transported back to the surgeons ... who did the operation ...," (TT 111) and Dr. Galloway agreed this was "essentially the standard, that you go back to *the surgeon* if there's any complications you go to the person that did the operation to re-evaluate since they know you best." (TT 111) (emphasis added) Dr. Klein agreed that "[i]t made better sense to go back to her treating physicians. I think in medicine the continuity of care is a very important issue." (TT 1372) The surgeon was Dr. Sethi, assisted by Dr. Tsen, *not* Dr. Gordon, who was merely a resident and may have been present at the surgery. (TT 93; Gordon depo. 68–71; Tsen

depo. 6) Dr. Galloway testified after he talked to Dr. Ossowski, that he spoke to "Suzy Gordon" at UMC with whom Dr. Galloway was obviously familiar. Significantly, he did not speak to Mary Esther's surgeon. This communication to UMC did not meet the standard of care for ensuring continuity of care.

12. Dr. Galloway claimed that he "shared with [Dr. Gordon] the information that was shared with" him, (TT 115) but Dr. Gordon did not recall receiving a call from Dr. Galloway. (Gordon depo. 54) Dr. Klein "agreed" it was imperative that Dr. Galloway have communicated adequate, appropriate, safe information to Dr. Gordon. (TT 1436) Dr. Klein agreed also "as one physician to another" Dr. Galloway, acting as a reasonably prudent doctor, would have called Dr. Gordon and at the very least said to her "Please call me when the patient gets there." (TT 1437) Dr. Klein added, "I will say that in a—even in a critically ill patient that an attending physician will contact a hospital, house staff officer, which Dr. Gordon was, and will inform them that a patient is being transferred, and the accepted standard is that the receiving physician, Dr. Gordon, will make an assessment and then contact the attending doctor once the patient has arrived. That's generally how things are done in this community." (TT 1441) Of course, Dr. Gordon did not have time to return the call to Dr. Galloway, if she received one, because "[w]hat [she] remembered about the morning of the 10th is that [she] was with [Mary Esther] from the time she arrived into the ICU. [She] did not leave her room

or her bedside until the time we stabilized her after the code." (Gordon depo. 23)

13. The crucial need for a comprehensive and accurate communication by Dr. Galloway to the UMC doctors was also indirectly confirmed through the testimony of Dr. Klein who remarked on how UMC at 3:00 in the morning "probably did not have all the full resources of the hospital available," and "late shifts aren't staffed to the same capacity as they are during the daytime." (TT 1376) He added in response to the Court's inquiry of whether UMC would have been prepared if properly notified of the critical status of this patient that "if a critically ill patient is arriving in an ICU, life threatening treatment is available and is *not* delayed." (TT 1377) (emphasis added).

14. The Court finds that there were serious and relevant miscommunications which fell below the standard of care, between Dr. Galloway and Dr. Ossowski, followed by one from Dr. Galloway to Dr. Gordon. Even assuming Dr. Galloway's version of the content of his conversation with Dr. Ossowski is accurate, and that he had a conversation with Dr. Gordon, there was an inexcusable failure by Defendant's employees to effectively and accurately communicate. Mary Esther was transferred by helicopter in the middle of the night from more knowledgeable and experienced doctors at PIMC ER to a less experienced, and uninformed one. This consumed critical time in her care and treatment, was a precipitant factor in her cardiac arrest, and was a proximate cause of her injuries.

d. The Non–Party At Fault Issue.

1. The "fourth" standard of care time frame involved the Defendant's burden of proving that UMC physicians fell below the standard of care. Defendant also had the burden of proving that UMC's breach was a proximate cause of the harm to Mary Esther.

2. The Court finds that the Defendant has met its burden of establishing that UMC was at fault in its treatment of Mary Esther and that the breach was a proximate cause of the cardiac arrest and Mary Esther's injuries.

3. Dr. Wohlgelernter, Plaintiff's expert, testified that the failure of UMC to adequately treat Mary Esther fell below the standard of care and was a cause of her injuries. (TT 362; 369) Further, it is evident to the Court that there was delay at UMC in obtaining labs and necessary tests of Mary Esther, and even Dr. Klein agreed that there was delay in treatment: "I feel there was some delay that occurred from her presentation [at UMC] to ultimately when the cardiac arrest occurred." (TT 1376)

4. The Court also finds that the Defendant, through its employee, Dr. Galloway, fell below the standard of care by his failure to take an active role in the treatment of Mary Esther upon her arrival at UMC.

5. Dr. Galloway testified that he "shared" the information he received from Dr. Ossowski with a resident at UMC who he obviously knew, by his reference to her as "Suzy Gordon," but he did not go to UMC because he was only a "consultant" and Mary Esther was "relatively stable." (TT 115) Dr. Gordon, however, did not recall receiving Dr. Galloway's call,

and she certainly did not consider herself as knowledgeable and as experienced as Dr. Galloway. She testified that she would have deferred to him in any treatment plan he ordered. She added, "Given my position as a junior resident, I would still respect the decision of the attending ... physician who handled this patient. I might not be in agreement with it, but as a surgery resident, it is not our usual practice to question the attendings." (Gordon depo. 66) Dr. Gordon added that at her "stage of training" when she treated Mary Esther she would not have considered telling Dr. Galloway he made a mistake. (Gordon depo. 99) Finally, she explained her role regarding Mary Esther "would have been that of the junior resident on the cardiothorasic service. That would include writing daily notes on the patient and participating in [her] routine care." (Gordon depo. 68–9) Certainly, Dr. Galloway knew Dr. Gordon was inexperienced when he allegedly called and spoke to her.

6. Even accepting Dr. Galloway's version of the telephonic consult with Dr. Ossowski, it was below the standard of care for him to attempt to "wash his hands of this situation" and not get more involved than he did when Mary Esther was returned to UMC. (TT 350) It is undisputed that Dr. Galloway knew that this was a "risky" operation for Mary Esther; (Cliff. depo. 48) that she had been discharged only 24 hours the day before, and was back in the emergency room; and that she was sent by AirEvac back to Tucson, which was a very unusual procedure for the Indian Health Service. Dr. Ossowski testified that when the Indian Health Service "transport[s] patients by air we don't usually do

that lightly. There's—there are serious considerations to take into account, the risks of flight ... so when I decided that ... she could go by air transport I thought ... the seriousness of her illness it was worth the risk." (TT 914) Finally and significantly, Dr. Galloway knew that Dr. Gordon, a resident, was the doctor at UMC who would treat Mary Esther, not her surgeon, and that hospitals are usually understaffed and under-equipped in the middle of the night.

7. Again, Dr. Klein by inference, established that the standard of care was violated by Dr. Galloway's failure to become actively involved in Mary Esther's care when she was returned to UMC. He testified "[w]orking in hospitals, many times in the middle of the night, unfortunately, you end up with delays;" "in the late shifts, aren't staffed to the same capacity as they are during the daytime. For instance, if you want to get a chest x-ray it's hard to get the x-ray technician to come because she has to go in many directions, or he, in many directions, and patients, and they don't have the full staff. And if you request orders to be written, there may not be a clerk available because she has to share several areas, and it is more time consuming to do things in the middle of the evening." (TT 1376–77) Certainly, Dr. Galloway, who worked on a frequent basis with UMC, and who was considered one of the "finest physicians," knew of these frailties of treating patients at UMC at 3:00 in the morning. (Sethi depo. 101).

8. Plaintiff's expert testified, and the Court agrees, that Mary Esther's critically ill condition had started to

become inescapable, and gave the UMC care givers only 50–80 minutes to prevent the cardiac arrest and harm to her when she arrived. (TT 362) Hence, Dr. Galloway's involvement at UMC was "mandatory." (TT 366, 370)

9. The Court finds, as did Plaintiff's expert, had Dr. Galloway, a specialist; a cardiologist; a treater; the IHS physician familiar with this particular patient's history; and the person who had discharged her the very night before, asked to be kept informed in this emergency critical case instead of going back to bed he could have prevented her cardiac arrest and injury. (TT 370–71) When asked by the Court what Dr. Galloway could have accomplished in the nature of "direct involvement" when Mary Esther was returned to UMC, and which would have made difference, Dr. Wohlgelernter stated: "He could have told them to administer additional intravenous fluids, to administer a red blood cell transfusion, to continue Dopamine to help augment their pressure, to recheck the chemistries and blood gases, and to implement measures to collect elevated potassium levels and elevated acid levels, if present ..." (TT 370)

10. Instead of Dr. Galloway taking an active role in the care of Mary Esther, Dr. Gordon, with little knowledge of what occurred in the past five hours, struggled alone by the bedside of Mary Esther until after her code. It is also important that Dr. Galloway was a specialist in cardiology and he was referred Mary Esther by Dr. Clifford because he had a systematic way of caring for Indian heart patients and following them up to ensure continuity of care. (Cliff. depo. 35–36) Everyone who knew him agreed that Dr. Galloway was a very good doctor and cardiologist. (Cliff. Depo. 35–26; Sethi depo. 101)

11. Dr. Galloway's failure to get involved and properly communicate with the physicians at UMC contributed to Mary Esther's cardiac arrest and was a proximate cause of her injuries.

## CAUSATION

1. All experts agreed that the cardiac arrest at 5:00 a.m. caused a significant disruption of oxygen to Mary Esther's brain. She was resuscitated and her heart was re-started. Although her life was saved, she survived with permanent injuries including becoming a functional quadriplegia, and brain impairment. She has diminished neurologic and cognitive functioning, and will depend totally on others for her care.

2. The contested issue on causation was whether, as Plaintiffs contended, the cardiac arrest resulted from the failure of medical providers to investigate, evaluate, intervene and treat a slowly deteriorating volume depleted patient. Alternatively, the issue was whether, as Defendant maintained, the cause was a sudden unmasking of left ventricular failure at 5:00 a.m. Plaintiff's expert, Dr. Wohlgelernter, bluntly rejected Defendant's expert's opinion, and when the Court inquired of Dr. Wohlgelernter why she should adopt his opinion, he responded by relying principally on his experience. Neither of these very qualified doctors persuaded the Court that there was virtual certainty regarding the cause of the cardiac arrest, but the Court is cognizant of the vicissitudes of medical science, and that certainty of cause is

sometimes impossible, particularly when a retrospective evaluation is made from voluminous records, which include documents demonstrating a failure to carefully chart, test, and analyze the patient before the arrest.

3. Plaintiffs' expert, Dr. Daniel Wohlgelernter, opined based on the medical evidence available to him, the cardiac arrest resulted from a series of events that resulted from a volume depleted, over exerted, recovering heart patient whose problems were not effectively recognized and/or treated over a 5–7 hour period at PIMC ER and UMC. (TT 318–385)

4. He further explained that the medical events from Mary Esther's volume depletion caused hypoperfusion (decreased blood/oxygen to end organs) and metabolic acidosis (increased acid levels). He said eventually, abnormally high potassium levels or hyperkalemia, plus hypovolemic shock, threatened the capacity of her heart to function. These events then produced her cardiac arrest which resulted in oxygen deprivation to the brain. He concluded that each of these events were recognizable, treatable, and easily reversible simply by following basic emergency care principles. (TT 318–385)

5. Plaintiffs also called Ron Fisk, M.D., a board certified neurologist, who repeated that the net effect of the unreversed hypotension and hypovolemia was a decrease in blood flow to end organs, and that the body switched from aerobic to anaerobic metabolism allowing for lactic acid accumulation. (TT 481–82) He also testified that morphine sulfate in a hypotensive patient impaired respiration resulting in further impairment of the body's ability to compensate for the low blood pressure. (TT 482)

6. Dr. Klein's, Defendant's expert, theory was, at the time he prepared his report in 1998, that Mary Esther's "respiratory cardiopulmonary arrest was due to the consequences of systemic hypotension, with the development of increasing metabolic acidosis and failure to maintain adequate respirations..." This condition he attributed to "left ventricular failure, unmasked by her recent mitral valve surgery or possibly as a consequence of an occult infection." (EX. 202) Noticeably absent from this report, however, were any reasons, medical facts or test results to support his conclusion. At the time of trial Dr. Klein initially concluded that the cause of Mary Esther's cardiac arrest was that she "had hypotension probably from multiple causes, one of which may be some element of volume depletion. An element, I think, of left ventricular dysfunction, or cardiac dysfunction, the failure of the heart to act as a pump, and there may have been infection, and the patient was also somewhat anemic. So I think all these factors were present and ultimately led to her arrest." (TT 1378) Later, Dr. Klein abandoned his position that the cardiac arrest was possibly caused by an occult infection, and rested solely on his view that there must have been an unmasked ventricular dysfunction. (TT 1450) Dr. Klein also conceded at trial that his conclusions at the time of his deposition had been characterized by him as "hypotheses," (TT 1393; 1447) but at trial he elevated them to opinions; he testified "that's an opinion, not a hypothesis." (TT 1398) He did not elucidate the reasons for strengthening the certainty of his conclusions first given at the time of his deposition and then again at trial. Moreover, it is crucial that he had reviewed *all*, which was a

considerable amount, of medical records and other materials relevant to the cardiac arrest prior to his deposition. Dr. Klein appeared to support his view that the cause was an unmasked left ventricle dysfunction with a reference regarding a left ventricle dysfunction in the "operative report," prepared after or during the surgery performed to evaluate Mary Esther's heart, post cardiac arrest. This reference he admits, however, is inconsistent with the two echocardiograms (transthoracic, transesophageal) performed after the cardiac arrest, just before, and during the operation conducted to evaluate the condition of Mary Esther's heart. (TT 1397) Further, Dr. Klein admitted that it is also inconsistent with the opinion of Dr. Copeland, the surgeon who performed the operation to evaluate her heart, who found, "that her heart was functioning well." (TT 1400) Dr. Klein stated without explanation that the echocardiograms were "technically hampered,"and "[i]t was hard for them, I think, to interpret." (TT 1397; 1459) But he readily "agreed" that Dr. Copeland knew what he was talking about when Dr. Copeland actually had the heart in his hand, was looking at it, and found that it was a well functioning heart. (TT 1400) He also admitted that his opinion of the unmasking of the left ventricle dysfunction never occurred again in Mary Esther's life. Also, Dr. Wohlgelernter offered a persuasive explanation for the post-surgical note referencing a left ventricular dysfunction. He explained that it probably pertained to the residual effects from the mitral valve replacement, and was in no way correlated to the cardiovascular collapse going on all through the hours of the 9th and 10th. (TT 377, 382) Finally, in his pretrial Rule 26(a)(2) report, Dr. Klein suggested that Mary Esther's cardiopulmonary arrest "could not be prevented." (TT 1384–85) "She was going to have it no matter what was done." (TT 1385, 1451) In his deposition, however, he explained how the cardiac arrest could have been avoided "[w]ith effective treatment, raising fluid volume and effective treatment raising blood pressure, Mary Esther would not likely have sustained a cardiac arrest." (TT 1451)(reading from Dr. Klein's deposition at page 79) This was supported by his opinion at trial "that this patient had hypovolemia probably from multiple causes, one of which may be some element of volume depletion." (TT 1378)

7. The Court finds Dr. Klein's opinion on causation unpersuasive, and that it is more probable than not that a cause of Mary Esther's cardiac arrest and injury was untreated hypovolemia.

8. The Court agrees with Dr. Wohlgelernter that all the data, vital signs, chest x-rays, EKG and blood studies pointed to hypovolemic shock, hypovolemia and hypotension. (TT 345) Mary Esther's arterial blood gas studies demonstrated she had started metabolic acidosis slightly before 8:55 p.m. and she had arrived at UMC physiologically unable to sustain cardiac and pulmonary function at 4:50 a.m., eight hours later. (TT 353) An earlier arterial blood gas study provided a good baseline for Mary Esther's acid balance. (MR 107). The "pH" on September 3, 1994 was normal at 7.367. It was also normal at 8:55 a.m. on September 9, 1994 which was 7.48 (MR 78). Just 10 minutes before the cardiopulmonary arrest, her pH had fallen to severely abnormal at 7.096, (MR 107, TT 354–355), and was incapable of sustaining life (TT 354–376). As it fell below 7.36, it permitted a buildup of

acid and a level of 7.096 was "shockingly low and not compatible with normal function [which will] inevitably result in catastrophe by either cardiac arrest, or seizures or both." (TT 354, 376)

9. Although differential diagnoses do not appear anywhere in the medical charting for September 9–10, 1994, Dr. Ossowski and Dr. Gayton suggested certain differentials must have been "going through their minds" during the PIMC ER admission. (TT 458; 708, 757) Dr. Wohlgelernter has persuasively refuted any suggestion that these may have been a cause of the cardiac arrest. He demonstrated that "cardiac tamponade" was not a cause, and Dr. Copeland also ruled it out. (TT 1473–74) Defendant never urged that myocardial infarction, pulmonary embolism, or any other differential diagnosis was a cause of the cardiac arrest. Moreover, Dr. Klein did not adopt any of these differentials for his causation opinion, and it is not without significance that his "unmasked left ventricle dysfunction" was never among the diagnostic differentials of the doctors at PIMC ER.

10. The Court finds that Mary Esther's cardiac arrest and injuries were caused by the failure of the Defendant and the non-parties at fault to investigate, evaluate, treat and intervene in a slowly deteriorating volume depleted patient and that this failure was a proximate cause of Mary Esther's cardiac arrest and injuries.

## DAMAGES

1. Mary Esther was discharged from the PIMC on October 3, 1994, and transferred to Bryan's Healthcare Facility where she remained through November, 1995.

2. In November, 1995, she was transferred to Sunrise Mesa Healthcare Center.

3. After a rehabilitative evaluation, Mary Esther was transferred in the Summer of 1999 to Winslow Campus of Care in Winslow, Arizona near her extended family.

4. Originally, Mary Esther received intensive rehabilitative care, restorative nursing and maintenance therapies which she needed.

5. By the time of trial, Mary Esther was no longer comatose. She was responsive, but still totally dependent on others for daily care.

6. Mary Esther sustained profound organic brain damage, and the Court finds to a reasonable degree of medical probability, she will remain totally dependent on others for all activities of daily living for the remainder of her life.

7. She is substantially paralyzed on the left side of her body and is confined to a wheelchair, and is functionally "quadriplegic" with limited use of one arm.

8. She has both short-term and long-term memory deficits. She cannot remember anything other than "the simplest information."

9. Mary Esther arrived at the Winslow Campus of Care suffering from quadriplegia, cognitive deficits, depression, and dementia, which are permanent injuries. (TT 951–952)

10. Mary Esther's injuries have left her "child like" and her learning ability is greatly compromised. (TT 488)

11. Mary Esther is somewhat aware of her situation and her separation from her family.

12. Mary Esther's injuries and current condition have caused great distress to her children whose ages were 2, 8

and 10 in 1994. The family has disintegrated in Mary Esther's absence, and her husband's failure to love and care for their children. The children are now wards of the State, living apart from one another. After Mary Esther's injuries her husband "dropped [their children] off" with Sharon Curley Bahe in 1995 for about one year, and then he took them to Anita Carlson who cared for them for about two years. He told both Curley Bahe and Carlson that he would provide groceries for the children, but "he never did anything for them." (Curley Bahe, Carlson video depos.) Later, when Troy Nunsuch was incarcerated, "Child Protective Services came and got the children and put them in foster homes." (Carlson video depo.) Mary Lopez of Child Protective Services informed Mr. Nunsuch's probation officer in 1998 that "Betty Lou Kabinto had been caring for the two older children since their mother had a stroke and became disabled. Ms. Lopez stated that Kabinto told her that [Mr. Nunsuch] was never actively involved in raising his children; something he had not previously cared to do." (EX 216 at 45) At the time of trial Troy Nunsuch remained incarcerated for a conviction for sale of dangerous drugs.[4] Sharon Curley Bahe also testified that after Mary Esther was placed in a nursing home Troy Nunsuch had no involvement with the children. He told her that he was "too busy;" and "he was living with another lady." (Curley Bahe video depo.) She also testified that to her knowledge the government financial assistance for the children "never got to the children." (Curley Bahe video depo.)[5]

13. The Court finds, based upon the credible evidence presented, an award for loss of consortium is not warranted. Mary Esther and her husband had marital problems before her injuries. Witnesses testified he took her and the children to the reservation and then he "took off," "he left her from time to time," he "[went] out with another woman," and "doesn't come home." (Nelson, Chatto, Curley Bahe video depos) Sharon Curley

4. At the time of trial, Troy Nunsuch testified that he had previously been convicted of "several felonies" including DUI, attempted sexual assault, possession and sale of narcotics, and failure to register as a sex offender. He had also been arrested for possession of marijuana, possession of stolen property (fictitious plates) and outstanding warrants for contempt of court and DUI offenses. These convictions and arrests occurred between 1975 and 1998. (TT 596–629)

5. The Court also finds meaningful, that in the presentence reports for Mr. Nunsuch's convictions, both before and after his wife was injured, he claimed family problems and a sick wife to explain why he lied to law enforcement, and as support for pleas for leniency: "[Mr. Nunsuch stated that he] lied about his identity to the officer because he knew he had an outstanding warrant and was concerned because his wife was nine months pregnant." Regarding his conviction in 1993 he told the probation officer before he was sentenced that he was "the supporter of his family, and loves his wife and children very much. He would also like the Court to know his wife recently gave birth to their new baby, and because of her heart condition he needs to be present for her and her children." He was released from prison for his 1993 conviction in April of 1994 and in May of 1996 he was caught selling cocaine. Again, he told the probation officer in 1996: "Would hurt my wife and family if I go to prison. I would like leniency; should appreciate probation." The probation officer found him untruthful about his drug use. Finally, in the interview conducted by the probation officer in 1998, the officer concluded that Mr. Nunsuch "was not truthful during the interview as shown by the dates he said he was working in Phoenix/Mesa area." (EX 216 at 12, 13, 31, 38)

Bahe specifically testified that the nurses at the nursing home said he never showed up to visit her. (Curley Bahe depo.) Rena Nelson testified that Mary Esther did not want her husband to pick her up from UMC in Tucson on September 9, and when she was brought home on September 8, Mary Esther slept on a sofa while her husband slept in a bedroom. The next day her husband took their only vehicle leaving Mary Esther to travel by bus to get a necessary medical test. (Nelson video depo.) Finally, it is not without significance that Troy Nunsuch was convicted of and served time for sexual assault during their marriage while Mary Esther was pregnant with their second child; when Mary Esther testified at trial she did not mention her husband; Trudy Kelly, her care giver, testified that when she visited Mary Esther on December 8, 1999 she "tried to discuss her husband, Troy Nunsuch, with her." Mary Esther informed Ms. Kelly that she threw away a card he had sent her and "denied he was with—he was her husband, and became angry that [Ms. Kelly] even suggested he was;" and Mr. Nunsuch was arrested for domestic violence committed against Mary Esther during their marriage. (TT 622–624, 1200, EX 216 at 14) To be entitled to damages for loss of consortium the Court must find that the spouse lost consortium which existed prior to the injuries of the spouse and which was lost as a consequence of the injuries sustained. The facts and circumstances of the Mary Esther—Troy marriage as it existed before September 10, 1994 make clear that there was "no companionship, conjugal affections and assistance of the other" before Mary Esther's injuries to warrant an award to either Troy or Mary

Esther of loss of consortium. It appears at least possible that Mr. Nunsuch abandoned, at the time of his trial testimony, his claim for any damages. When, asked by his counsel how he would respond to the claim by the attorney for United States that he "should not recover anything," he testified "[t]hat's fine." (TT 619) *City of Glendale v. Bradshaw,* 503, P.2d 803, 805, (1972).

14. The Court finds from the evidence presented that Mary Esther still can perceive physical pain, and she has had some adverse emotional reactions to her daily situation, but there is no evidence that she suffered, regularly suffers, or that she will suffer in the future significant pain. If she receives complete reasonable care and attention for her medical needs as discussed below, she should not suffer pain or discomfort at any time during the remainder of her life. To some extent, her awareness of any pain she might otherwise have suffered has been diminished by the injuries to her brain. An award for pain and suffering is a matter of reasonable judgment. The amount should not be so high as to shock the conscience or so low that justice is not effectuated. The award to Mary Esther, as to her sole and separate property, for her pain and suffering is $50,000.00.

15. The Court has found from the evidence presented that the injuries she sustained are totally disabling and permanent. They include impairments of both mental and physical functions based upon the loss of ability to communicate, ambulate, and care for her needs. Again, an award for permanent loss is a matter of reasonable judgment. The Court finds the $700,000.00 is reasonable for her permanent loss and the Court will

award such amount to Mary Esther as her sole and separate property. *See Ogden v. J.M. Steel Erecting, Inc.,* 201 Ariz. 32, 31 P.3d 806, 2001 WL 579805 (2001)

16. The circumstances of Mary Esther's life as it existed before her injuries are relevant in determining her life expectancy and an appropriate award for loss of enjoyment of life. The Court finds Mary Esther lived less than an idyllic life before she was injured. She abused alcohol; was often the sole support of her three children; lived near poverty level; was often sick because of a defective mitral valve and alcohol abuse; and she had marital problems, in large part because of the irresponsibility of her husband. Anita Carlson and Sally Chatto testified that Mary Esther was the only one working and supporting the children, and that she was on food stamps. Dr. Clifford testified that Mary Esther was the sole source of support for her family, and he thought it incredible that her husband ever worked because "he didn't any time that I knew him." (Cliff. depo. 84) Anita Carlson, Sharon Curley Bahe, and Rena Nelson all testified that Mary Esther would come to the reservation with the children without her husband, and he would "take off" and leave her from time to time. On occasion, before her injuries, Anita Carlson took care of the children while Troy Nunsuch was incarcerated so that Mary Esther could work. Sally Chatto, Sharon Curley Bahe, and Rena Nelson said Troy went out with other women. Dr. Clifford testified that Mary Esther "had a drinking problem;" "she was an alcoholic, and she had liver disease in the past;" "she had very elevated liver enzymes, and [he] was pretty sure she had alcoholic hepatitis," and "she got

pretty sick" over the years he saw her. (Cliff. depo. 43, 47–48, 64) Despite the unfortunate aspects of her life before her injuries, it appears from credible testimony of those who knew her, she loved her children and enjoyed her relationship with them. She also enjoyed her work, and spending time with her extended family members on the reservation. (Sally Chatto, Sharon Curley Bahe, Anita Carlson video depos, and testimony of Mary Alice Nunsuch) Moreover, now, despite the recent improvement in her mental and physical health and living conditions, she continues to miss her family and family members.

17. The Court finds her life expectancy to be 30 years. This takes into account all of Mary Esther's health problems prior to her injuries, which the Court finds shortened her life expectancy, and that she will continue to receive complete, reasonable medical care and attention for the remainder of her life.

18. The Court finds that Mary Esther has suffered a loss of enjoyment of life as a result of her permanent injury, taking into account the features of her life before her injuries, discussed above, and her abiding love for her children and family. Again, this award recognizes that because of her brain injury she is not completely aware of her condition, and if she continues to receive complete reasonable care and attention for her medical needs as discussed below, she should not suffer pain and discomfort for the remainder of her life. The award to Mary Esther for loss of enjoyment of life is $100,000.00 as her sole and separate property. *See Ogden v. J.M. Steel Erecting, Inc.,* 201

Ariz. 32, 31 P.3d 806, 2001 WL 579805 (2001)

19. The Court finds that Mary Esther's children have suffered a loss of consortium. Before her injuries Mary Esther had, at least, a good relationship with all of her children, but particularly Mary Alice. Her permanent disabilities have nearly destroyed her relationship with all of her children and devastated their lives. *Villareal,* 774 P.2d at 213. Defense counsel did not dispute that an award to the children for loss of consortium would be appropriate if the Defendant was found liable. (TT 1509) The Court will award loss of consortium of $900,000.00 to each of Mary Esther's children, to be held in trust for them until they reach the age of majority

20. At trial, Gregory Phillip Dovico testified that Mary Esther's past medical expenses are represented in the unnegotiated AHCCCS lien in the amount of $225,000.00. (TT 1258) This amount may have increased since the trial, and the Court finds that Mary Esther is entitled to recover all past medical expenses.

21. The Court finds without adequate care, Mary Esther's health will fail (TT 497–498) and that she will need, for the rest of her life, 24 hours a day, 7 days a week, 365 days a year, "skilled nursing care." (TT 497–98, 651) She will always need physician services from three or four specialties, and she will need various therapies for life. (TT 658–660) She has "sever spasticity" and "painful contractions" and many other problems and to avoid these severe complications she requires "regular and persistent" and "complete" care. (TT 1297–98, 1192) It is evident to the Court as experts testified that she will "give up" without this level of care, and regress to a depressed state of dependency. (TT 1300–1314)

22. The Court finds that the appropriate discount rate for future wages and medical expenses is 6%. Although Dr. Whalen obtained a 6% discount rate using a 50–year period, and Mr. Bjorklund used a 10–year period, Bjorklund at one point utilized a discount rate of 6%. In two of his reports, Mr. Bjorklund used discount rates between 4.82% and 5.45%. The variance in the rates used by Mr. Bjorklund demonstrates that the discount rate is dynamic, and can vary greatly over a short period of time. Accordingly, a 6% discount rate is the most appropriate rate.

23. The Court finds that Mary Esther is entitled to recover her past and future lost wages. Although she had a sporadic work history and suffered in the past from alcohol abuse, the Court finds that Plaintiff would have been able to earn $8,000 per annum beginning in 1994. Her wages would have risen at the rate of 3.5% per annum, which rate is selected because it more accurately reflects the raises actually received by Mary Esther, and pay increase rates are a function of two factors: inflation and increased productivity. *See Trevino v. United States,* 804 F.2d 1512, 1518 (9th Cir. 1986). Accordingly, Mary Esther is entitled to past lost wages in the amount of $54,596 for wages she would have earned from October, 1994 through October, 2000 (6.2 years). The Court also finds Mary Esther is entitled to recover future wages for an additional 14.3 years. Utilizing a 6% discount rate, a 3.5% wage increase rate, a base salary of $9,834 for the year 2000, and 14.3 as the number of years Plaintiff would work from November, 2000, Plaintiff

is entitled to recover $56,250 in future lost wages. This figure is reached by utilizing the formula for computing present value supplied by Dr. Whalen in his report. The rate of increase equals 3.5, the rate of discount equals 6, and N equals 14.3. A factor of .40 is obtained.[6]

24. The Court finds that an inflation rate of 6% is appropriate with respect to future expenses for nursing care, doctors, therapy, and medical exams, and such a rate realistically reflects the rate of inflation for such expenses. Dr. Whalen recommended a rate of 6.4%, which he based upon the Consumer Price Index ("CPI"). Mr. Bjorklund recommended a rate of 3.1%, which he calculated himself because the CPI Index for nursing homes does not have a long history. Because the inflation rate for future expenses for nursing care, doctors, therapy, and medical exams is equal to the discount rate, they offset completely, but the Court has not utilized a total offset method. Rather, where the discount rate is equal to the rate of inflation for a given category, there is no need to discount an award to present value. *See Colleen*, 843 F.2d at 331. Because the Court has found that Plaintiff has a life expectancy of 30 years, and finds the nursing home costs are $71,175 per year, and medical care costs are $117,392 per year, Plaintiff is entitled to recover future nursing home and medical care costs in the amount of $5,657,010 (($71,175 + $117,392) × 30 = $5,657,010).

The Court will order that these funds be placed in a trust for the duration of Mary Esther's life with a reversion to the United States government, if Mary Esther fails to live out her full life expectancy. *Hull v. United States*, 971 F.2d 1499, 1505 (10th Cir. 1992); *Hill v. United States*, 854 F.Supp. 727, 732 (D.Colo.1994), *later opinion*, 864 F.Supp. 1030 (D.Colo. 1994); *MacDonald v. United States*, 900 F.Supp., 483, 486–87 (M.D.Ga. 1995) Although a conservator and guardian have been appointed for Mary Esther she still remains married to Troy Nunsuch, who has demonstrated a selfish lack of responsibility for his wife and children. As her husband he could inherit the trust assets at Mary Esther's death. Hence, it is in the best interests of Mary Esther that a trust be created which reverts to the government at her death. *Hull*, 971 F.2d at 1503.

25. With respect to future medical commodities, Dr. Whalen recommended an inflation rate of 3.4%, whereas Mr. Bjorklund recommended an inflation rate of 5%. Dr. Whalen's rate, which is less favorable than Bjorklund's rate, will be utilized. Using a 30–year life expectancy (N=30), a rate of increase of 3.4%, and a discount rate of 6%, a factor of .38 is reached. Applying that factor and utilizing a base cost of $10,541, the Court finds that Plaintiff is entitled to recover future medical commodity costs in the

6. The Court is aware that Troy Nunsuch, as Mary Esther's husband, may make claim to one-half of the wages as part of the community property. The Court will order that no funds be distributed to Mr. Nunsuch until all legal obligations, claims and liens against him made or held by any and all government agencies, individuals and corporate entities have been satisfied, including all claims for the care of his children, Mary Alice, Tyrone and Tray. The Court is aware that Mr. Nunsuch may have been ordered to pay a fine of $1,600.00 for his conviction in cause Nos. CR 96000437/CR 96000538/CR 97000253 for attempted sale of dangerous narcotics in Navajo County. (EX 216)

amount of $120,167 ($10,541 × 30 × .38 = $120,167).

26. No deductions will be made for any social security benefits received by Plaintiff. *See Siverson v. United States,* 710 F.2d 557, 559–60 (9th Cir. 1983). (Arizona's collateral source doctrine) and *Barnett v. American Family Mutual Ins. Co.,* 843 P.2d 1302, 1308 (Colo.1993) holding that Colorado's collateral source statute precluded offsets for Social Security Disability Insurance benefits because they are based upon payments made by or on behalf of the injured party. In addition, no deductions will be made for consumption. *See Yako v. United States,* 891 F.2d 738, 747 (9th Cir.1989).

27. Income taxes must be deducted from an award under the FTCA. *See Shaw v. United States,* 741 F.2d 1202, 1206 (9th Cir.1984). However, earning $8,000 per year, and adjusting that amount upward by 3.5% annually, the Court finds Plaintiff would not have earned enough money to owe any federal or state income taxes, and no deductions (or additions for future taxes) need to be made.

28. Plaintiffs have met their burden of proof and have proven all damages and all elements of their claim by a preponderance of the evidence. The Court agrees with the Defendant that "in the absence of agreement by the parties to structure the future care award, the law leaves the Court with no alternative but to order the payment of a lump sum judgment." *Reilly v. United States,* 665 F.Supp. 976, 1016–1020 (D.R.I.1987); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 533, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) ("[t]he award could in theory take the from of periodic payments, but in this country it has traditionally taken the form of a lump sum, paid at the conclusion of the litigation.")

29. **The Court finds Plaintiffs' total damages to be:**

| Mary Esther Nunsuch | Dollars |
|---|---|
| Cost of future medical care and treatment | $5,657,010.00 |
| (Reduced to Present Value) future medical commodity costs | 120,167.00 |
| Past Medical Expenses approximate—to be determined by the AHCCCS lien | [255,000.00] |
| Loss of Past & Future Earnings (Reduced to Present Value) | 110,845.00 |
| Pain and Suffering | 50,000:00 |
| Permanent Disability | 700,000.00 |
| Loss of Enjoyment of Life | 100,000.00 |
| Tray Nunsuch (Loss of Consortium) | 900,000.00 |
| Tyrone Nunsuch (Loss of Consortium) | 900,000.00 |
| Mary Alice Nunsuch (Loss of Consortium) | 900,000.00 |
| Troy Nunsuch (Loss of Consortium) | $ 0 |

## ALLOCATION OF FAULT

30. Given the findings of this Court on all the issues presented, this Court has determined the total fault in the entire case to be:

**Defendant USA:**
**(Due to issues 1, 2, 3 and 4)** 70%

**Non–Party UMC:**
**(Issues 1 and 4 only)** 30%
100%

## ORDER

**ACCORDINGLY IT IS ORDERED** finding for Plaintiffs and against Defendant, and that Plaintiffs shall take judgment for $9,438,022.00, plus an amount equal to the past medical expenses as determined by the AHCCCS lien, (less 30% for the non-party at fault), plus costs as awarded by this Court.

**IT IS FURTHER ORDERED** Plaintiff's Motion to Clarify re: Testimony of Treating Physician Dr. Copeland [123–1] is granted, and Plaintiffs' Motion for Leave

to File Addendum/Reply to Defendant's "Final Causation" Argument [149–1], and Defendant's Motion to Strike Plaintiff's Motion for Leave to File Addendum/Reply [150–1] are denied as moot.

**IT IS FURTHER ORDERED** that the entire award to Mary Esther for future medical care and treatment and medical commodity costs will be placed in a trust for the duration of Mary Esther's life, with a reversion to the United States government, if Mary Esther fails to live out her full life expectancy.

**IT IS FURTHER ORDERED** that the entire awards to Mary Alice Nunsuch, Tyrone Nunsuch and Tray Nunsuch will be placed in individual trusts for each of them, until they reach the age of majority.

**IT IS FURTHER ORDERED** that no amount of this judgment will be distributed to Troy Nunsuch, Mary Esther's husband, if he is legally entitled to any portion of it, until all legal obligations, claims, judgments, liens against Troy Nunsuch made by any and all government agencies, individuals, and corporate entities have been satisfied, including those for the care of his children, Mary Alice, Tyrone and Tray.

**IT IS FURTHER ORDERED** that before any distribution of this judgment is made to Mary Esther, Mary Alice, Tyrone and Tray a hearing, pursuant to Fed. R.Civ.P. 17(c), will be held on *Friday, August 31, 2001 at 11:00 a.m.* with Plaintiffs' conservators and guardians to ensure proper protection for Mary Esther, Mary Alice, Tyrone and Tray. In preparation for such hearing the conservators and guardians for Mary Esther, Mary Alice, Tyrone and Tray are to have addressed with them and resolved what will be the disposition of their awards in the event of their demise.

**IT IS FURTHER ORDERED** that the Clerk shall enter Judgment in accordance with this Order.